UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SPIRIT & SANZONE DISTRIBUTORS CO., INC., and          08 CV 0251(LLS)
SALAMANCA-AREA BEVERAGE COMPANY INC.,

                              Plaintiffs,

                                        **DECLARATION OF**
                                        **WILLIAM SANZONE**

        -against –


COORS BREWING COMPANY,

                              Defendant.
-------------------------------------------------------------------x

        WILLIAM SANZONE, declares as follows:

        1.      I am the Vice President and General Manager of the Plaintiff Spirit &

Sanzone Distributors Co., Inc. ("Sanzone"), and as such I have personal knowledge of the

facts contained herein. I make this declaration in support of Plaintiffs' request for a

Temporary Restraining Order and Preliminary Injunction, pending the outcome of this

action:

        A.      Dismissing or, in the alternative, permanently staying, the underlying
                arbitrations (the "Arbitration") brought by Defendant against Plaintiff,
                Spirit and Sanzone Distributors Co., Inc under the auspices of the
                American Arbitration Association ("AAA"), bearing AAA case number
                13 155 02713 07  and  against Salamanca-Area Beverage Company, Inc.
                bearing AAA case number 13 155 02714 07  (collectively the
                "Arbitrations"); or in the alternative,

        B.      Temporarily staying the Arbitrations and all proceedings in connection
                therewith pending the entry of a judgment deciding this application.

        2.      The need for this relief is immediate because Defendant, Coors Brewing

Company ("Coors") has commenced an arbitration against Sanzone on December 11,

2007 in an attempt to terminate Sanzone's right to distribute Molson products.

3.    As a result, Sanzone was forced to commence the instant action to obtain an order from this Court (i) declaring, among other things, that Coors' attempt to terminate Sanzone's distribution agreement is unlawful because Coors is not implementing a national plan of consolidation that is reasonable, non-discriminatory and essential to Coors' business, as required by Section 55-c; and (ii) permanently staying the arbitration commenced by Coors. A true and correct copy of the complaint is annexed hereto as Exhibit A.

## BACKGROUND FACTS

4.    Sanzone is a New York corporation with its principal place of business located in Onondaga County, New York. Sanzone is a duly licensed, multi-brand distributor of alcoholic and non-alcoholic beverage products within the State of New York.

5.    Sanzone has been a Molson distributor for over twenty years, having been granted the exclusive right to distribute Molson products in the State of New York, the counties of Herkermer, Oneida, Montgomery, Fulton, Schoharie and a portion of Hamilton county in 1986 pursuant to a letter of appointment with Martlet Importing Co., Inc., a former U.S. importer of Molson products ("Martlet"). Thereafter, Sanzone acquired the exclusive right to distribute Molson products in the counties of Cortland, Madison, and Onondaga, and a portion of Lewis County. A true and correct copy of the initial letter of appointment is annexed hereto as Exhibit B.

6.    Sanzone signed a written distribution agreement with Martlet for the distribution of the Molson products, in its exclusive territory. However, at this time, Sanzone has been unable to locate a copy of the signed agreement. Notwithstanding, by

letter dated October 28, 2002, annexed hereto as Exhibit C, Molson has confirmed the fact that Sanzone's distributor agreement was the Martlet Distributor Agreement.

7.      It is our belief that that the Martlet Distributor Agreement signed by Sanzone is similar, if not identical, to the other Martlet Distributor Agreements that were being offered to New York distributors of the Molson products during this time period. As such, annexed hereto as Exhibit D is a copy of the Martlet Distributor Agreement, which was provided to other New York distributors of Molson products.

6.      In the late 1990s, Martlet's importing rights to the Molson products were assigned to a joint venture between Miller Brewing Company and Molson Canada. Thus, at the time, the Miller-Molson joint venture became the supplier of Molson products to Sanzone for its exclusive territory. Sanzone's primary domestic brand is, and was at the time of the Miller-Molson joint venture, Miller. Miller did not require Sanzone to sign a written distribution agreement with respect to the Molson products when Miller was responsible for importing Molson products pursuant to the Miller-Molson joint venture.

7.      Molson's relationship with Miller ended in 2000. Thereafter, in December 2000 a joint venture was formed between Molson Inc. and the Coors Brewing Company (Molson 2000 LLC) for the sole purpose of distributing Molson products in the United States.

8.      When the joint venture assumed responsibility for the distribution of Molson products in January 2001, it proffered new distribution agreements to its wholesalers, which it titled "Amendment to Distribution Agreement" (the "Molson Amendment").

9.      Molson 2000 LLC required that Sanzone execute the Molson Amendment.

10.     The Molson Amendment amended and materially modified Sanzone's prior distribution agreements in that it contained, among other terms, a broad pre-dispute arbitration clause which was not a term of Sanzone's prior distribution agreements.

11.     Sanzone was not involved in a case or controversy with Molson 2000 LLC, which later changed its name to Molson USA LLC ("Molson USA"), at the time Molson required that the Molson Amendment be signed.

12.     On January 29, 2001, Sanzone executed the Molson Amendment. A true and correct copy of the executed Molson Amendment is annexed hereto as Exhibit E.

13.     Because Sanzone was a party to the Prior Martlet Agreement, Section 1.1 of the Molson Amendment, states that the relationship between Molson and Sanzone would be governed by the terms of the Prior Martlet Agreement, as amended by the Molson Amendment, annexed hereto as Exhibit D.

14.     In late 2002, Molson USA contacted Sanzone and announced that it was consolidating its distributors in the New York market and aligning its distribution channel with Coors distributors.

15.     Throughout 2003, Sanzone engaged by way of its legal counsel in correspondence with Molson USA disputing Molson USA's right and effort to consolidate the New York market.

16.     Upon information and belief, on February 9, 2005, the parent companies of Coors and Molson announced a merger, which resulted in the formation of Molson Coors Brewing Company ("Molson Coors"). Molson USA continued its operations as a wholly owned subsidiary of Molson Coors.

17.     On March 11, 2005, Molson USA again, in writing, acknowledged that it

adopted a nationwide policy of consolidation in 2002.

18.     By letter dated November 27, 2007, Defendant, Coors, announced to Sanzone, in connection with the dissolution of Molson USA, that Sanzone's distribution agreement was now assigned by Molson USA to Defendant, Coors. Coors also announced its intention to continue to implement Molson USA's consolidation policy. A true and correct copy of this letter is annexed hereto as Exhibit F.

19.     In an attempt to effectuate a termination of Sanzone's distribution agreement, on December 11, 2007, Coors filed a demand for arbitration with the American Arbitration Association ("Demand for Arbitration") based upon Molson USA's policy of consolidation. The arbitration proceeding commenced against Salamanca, bears AAA case number 13 155 02713 07. A true and correct copy of the Demand for Arbitration is annexed hereto as Exhibit G.

20.     As of this date, Sanzone has not participated in the Arbitration.

**WHEREFORE,** Plaintiffs respectfully request that this Court issue a Temporary Restraining Order and Preliminary Injunction, pending the outcome of this action as set forth in the Order to Show Cause submitted herewith.

I declare under penalty of perjury under the laws of the United States of America that the statements contained in this declaration are true and correct.

Executed on: January 16, 2008

_____
WILLIAM SANZONE

F:\Spirit & Sanzone\Molson\arbitration\Sanzone declaration.doc

**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SPIRIT & SANZONE DISTRIBUTORS CO., INC., and
SALAMANCA-AREA BEVERAGE COMPANY INC.,

                    Plaintiffs,

   -   against –

COORS BREWING COMPANY,

                    Defendant.
-------------------------------------------------------------------x

_____ CV _____

COMPL**JUDGE STANTON**

**08 CV 0251**

JAN 1 1 2008
U.S.D.C. N.Y.
CASHIERS

Plaintiffs Spirit & Sanzone Distributors Co., Inc., and Salamanca-Area Beverage

Company, Inc., by its attorneys Ettelman & Hochheiser, P.C., for their Complaint allege as

follows:

## SUMMARY OF ACTION

1.       This action seeks to prevent Defendant, a brewer, from unlawfully terminating its

agreements with Plaintiffs as distributors of Molson beer products based upon a purported

national policy of consolidation, which was implemented by another brewer, namely Molson

USA, LLC. Because the relationship between Plaintiffs and Defendant involves the sale of beer,

("ABC") is expressly governed by Section 55-c of the New York Alcoholic Beverage Control

Law, a remedial statute designed to level the playing field by and between brewers and

wholesalers. Pursuant to Section 55-c, a distribution agreement between a brewer and a

wholesaler can only be terminated based on "good cause" as defined by the statute. The

definition of "good cause" is exceedingly narrow, limited essentially to (i) the implementation by

a brewer of a national or regional policy of consolidation that is "reasonable, non-discriminating,

and essential," to the brewer and (ii) the failure to comply with a material term of the distribution

agreement after notice and an opportunity to cure.  ABC §55-c(2)(e).

2.    In an attempt to effectuate the termination of Plaintiffs as distributors of Molson products, on December 11, 2007, Defendant commenced two separate arbitrations before the American Arbitration Association alleging that it can terminate Plaintiffs based upon a consolidation policy that Defendant adopted from a dissolved brewer, Molson USA LLC. However, because there is no valid agreement to arbitrate this dispute, and Plaintiffs have not agreed to arbitrate this dispute, Plaintiffs seek an order from this Court (i) declaring, among other things, that Defendant's attempt to terminate Plaintiffs' distribution agreements are unlawful because Defendant is not implementing a national plan of consolidation that is reasonable, non-discriminatory and essential to this Defendant's business, as required by Section 55-c; and (ii) permanently staying  the arbitrations commenced by Defendant.

## THE PARTIES

3.    Plaintiff Spirit & Sanzone Distributors Company, Inc. ("Sanzone"), is a New York corporation with its principal place of business located in Onondaga County, New York.

4.    Plaintiff Salamanca-Area Beverage Company, Inc. ("Salamanca"), is a New York corporation with its principal place of business located in Cattaraugus County, New York.

5.    Sanzone and Salamanca are duly licensed, multi-brand distributors of alcoholic and non-alcoholic beverage products within the State of New York.

6.    Upon information and belief, defendant Coors Brewing Company ("Coors") is a Delaware corporation with its principal place of business located in Jefferson County, Colorado.

7.    Upon information and belief, Coors is a brewer, seller, and importer of beer products within the State of New York.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2),

because plaintiffs are citizens of New York and Coors is deemed a citizen of Delaware or

Colorado, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

9.      Venue lies in this District pursuant to 28 U.S.C. §1391(a)(2) and (a)(3), and 28

U.S.C. §1391(c).

## PLAINTIFFS' RELATIONSHIP WITH MOLSON/COORS

10.     Sanzone has been a Molson distributor for over twenty years, having been granted

the exclusive right to distribute Molson products in the State of New York, the counties of

Cortland, Fulton, Herkimer, Madison, Montgomery, Oneida, Onondaga and Schoharie, and

portions of Hamilton and Lewis County in 1986 pursuant to a distribution agreement with

Martlet Importing Co., Inc., a former U.S. importer of Molson products ("Martlet").

11.     Salamanca became a distributor of Molson products in 1995 when Salamanca was

granted the exclusive right to distribute Molson products in the State of New York in a portion of

Cattaraugus County from Martlet. Thereafter, in 1997, Salamanca was granted the exclusive

right to distribute Molson products in the county of Chautauqua. Salamanca was not required to

sign a distribution agreement relating to the Molson products when it obtained the distribution

rights to the brand.

12.     In the late 1990s, Martlet's importing rights to the Molson products were assigned

to a joint venture between Miller Brewing Company and Molson Canada. Thus, at the time, the

Miller-Molson joint venture became the supplier of Molson products to both Sanzone and

Salamanca for their respective exclusive territories.

13.     The Miller-Molson relationship was short-lived with Molson deciding by late

2000 that it would be better served if it terminated its relationship with Miller. In October 2000, Molson bought back its distribution rights to the Molson products from the joint venture.

14.    Almost immediately after terminating its distribution relationship with Miller, Molson determined that it was now in its best interest to align with the Coors Brewing Company, and in December 2000 a joint venture was formed between Molson Inc. and the Coors Brewing Company (Molson 2000 LLC) for the sole purpose of distributing Molson products in the United States.

15.    When the joint venture assumed responsibility for the distribution of Molson products in January 2001, it proffered new distribution agreements to its wholesalers, which it titled "Amendment to Distribution Agreement" (the "Molson Amendment").

16.    In violation of the New York Alcoholic Beverage Control Laws §55-c ("Section 55-c" or the "Statute"), Molson 2000 LLC required that Sanzone and Salamanca execute the Molson Amendment.

17.    The Molson Amendment amended and materially modified Plaintiffs' prior distribution agreements in that it contained, among other terms, a broad pre-dispute arbitration clause in violation of Section 55-c, whereas neither Sanzone nor Salamanca's prior distribution agreements contained an arbitration clause.

18.    Neither Plaintiff was involved in a case or controversy with Molson 2000 LLC, which later changed its name to Molson USA LLC ("Molson USA"), at the time Molson required that the Molson Amendment be signed by Sanzone or Salamanca.

19.    On January 2, 2001, Salamanca executed the Molson Amendment.

20.    Because Salamanca did not have a prior written distribution agreement, Section 1.2 of the Molson Amendment states that the relationship between Molson and Salamanca would

be governed by the terms of the "Prior Molson Agreement," as amended. The Prior Molson Agreement is annexed to the Molson Amendment as Exhibit A.

21.    On January 29, 2001, Sanzone executed the Molson Amendment. Because Sanzone was a party to the Prior Martlet Agreement, Section 1.1 of the Molson Amendment, state that the relationship between Molson and Sanzone would be governed by the terms of the Prior Martlet Agreement, as amended by the Molson Amendment.

22.    In early 2001, almost immediately after the formation of the Molson/Coors joint venture, Molson USA formulated and began to implement what it called its policy of consolidation.

23.    By late 2002, Molson USA contacted Sanzone and Salamanca and announced that it was consolidating its distributors in the New York market and aligning its distribution channel with Coors distributors.

24.    Throughout 2003, Sanzone and Salamanca engaged by way of their legal counsel in correspondence with Molson USA disputing Molson USA's right and effort to consolidate the New York market.

25.    Upon information and belief, on February 9, 2005, the parent companies of Coors and Molson announced a merger, which resulted in the formation of Molson Coors Brewing Company ("Molson Coors"). Molson USA continued its operations as a wholly owned subsidiary of Molson Coors.

26.    On March 11, 2005, Molson USA again, in writing, acknowledged that it adopted a nationwide policy of consolidation in 2002. This was the last correspondence Molson USA ever sent to Sanzone or Salamanca regarding consolidation.

27.    Six years later, by letter dated December 2, 2007, Defendant, Coors Brewing

Company ("Coors"), announced to Sanzone and Salamanca, in connection with the dissolution of Molson USA, that Plaintiffs' respective distribution agreements were now assigned by Molson USA to Defendant, Coors. Coors also announced its intention to continue to implement Molson USA's consolidation policy.

## SECTION 55-C OF THE NEW YORK ALCOHOLIC BEVERAGE CONTROL LAW

28.    The relationship between "brewers" and "wholesalers" of beer in New York is regulated by Alcoholic Beverage Control Law Section 55-c.

29.    Under Section 55-c(2)(a), an "Agreement" is defined as any contract, agreement, arrangement, course of dealing or commercial relationship between a brewer and a beer wholesaler pursuant to which a beer wholesaler is granted the right to purchase, offer for sale, resell, warehouse or physically deliver beer sold by a brewer.

30.    A "Brewer" is defined as any person or entity engaged primarily in business as a brewer, manufacturer of alcoholic beverages, importer, marketer, broker or agent of any of the foregoing who sells or offers to sell beer to a beer wholesaler in New York, or any successor to a brewer, under Section 55-c(2)(b).

31.    "Beer wholesaler" and "wholesaler" means the holder of a wholesaler's license pursuant to Section fifty-three of the Alcoholic Beverage Control Law who purchases, offers to sell, resells, markets, promotes, warehouses or physically distributes beer sold by a brewer, under Section 55-c(2)(d).

32.    Coors is a "brewer" with respect to the Molson Products under Section 55-c.

33.    Sanzone is a "wholesaler" with respect to the Molson Products under Section 55-c.

34.     Salamanca is a "wholesaler" with respect to the Molson Products under Section 55-c.

35.     In enacting §55-c, New York recognized the substantial role wholesalers play in the development of the market and good will of a brewers' products, and sought to protect the significant investment of capital and resources by New York wholesalers by prohibiting, under Section 55-c(4), the termination or the material modification of "Agreements" except for "good cause."

36.     "Good cause" is defined, *inter alia*, as the implementation by a brewer of a national or regional policy of consolidation which is reasonable, nondiscriminatory and essential, under Section 55-c(2)(e)(i)(A).

37.     In 2001, the statute was amended, requiring pursuant to Section 55-c(2)(e)(i)(A), that such policy of consolidation shall have previously been disclosed in writing, in reasonable detail to the brewer's wholesalers, and shall result in a contemporaneous reduction in the number of a brewer's wholesalers not only for a brand in this state, but also for a brand in contiguous states or in a majority of the states in which the brewer sells the brand.

38.     Section 55-c(6) provides that a beer wholesaler may maintain a civil action in a court of competent jurisdiction within this State.

39.     Section 55-c(7) provides that "[n]o brewer or beer wholesaler may impose binding arbitration of any issue as a term or condition of an agreement."

40.     Under Section 55-c(11), the protections granted to wholesalers under Section 55-c "may not be altered, waived or modified by written or oral agreement in advance of a bona fide case and controversy arising under a written agreement complying with this section."

### THE DISPUTE

41.    In an attempt to effectuate a termination of the Sanzone and Salamanca distribution agreements, on December 11, 2007, Coors filed two separate demands for arbitration with the American Arbitration Association ("Demands for Arbitration") against Sanzone and Salamanca, respectively, based upon Molson USA's policy of consolidation. The arbitration proceeding commenced against Sanzone, bears AAA case number 13 155 02713 07 and the proceeding commenced against Salamanca, bears AAA case number 13 155 02714 07, (collectively the "Arbitrations").

42.    The Demands for Arbitrations are purportedly based on the pre-dispute arbitration clause contained in the Molson Amendment. However, the demands ignore the terms of the distribution agreements and the provisions of Section 55-c, which expressly govern the parties' relationships.

43.    In these Arbitrations, Coors asserts that as assignee of Molson USA's rights under the distribution agreements, Coors is able to pursue Molson USA's consolidation policy and terminate Sanzone and Salamanca.

44.    Coors also seeks to litigate the constitutionality of §55-c by alleging that the provisions of Section 55-c relating to a brewer's ability to terminate a distribution agreement pursuant to a national policy of consolidation violate the Dormant Commerce Clause of the United States Constitution in that it impermissibly regulates the conduct of Molson and Coors beyond the boundaries of the state of New York.

45.    Accordingly, in the Arbitrations, Coors seeks an award declaring that Coors, as a result of the Molson USA consolidation plan, has the right under Section 55-c to terminate the distribution agreements by which Plaintiffs distribute Molson products in their assigned territories.

## FIRST CLAIM FOR RELIEF
(Declaratory Relief)

46.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 44

as if more fully set forth at length herein.

47.     There is an actual controversy between Plaintiffs Sanzone and Salamanca and

Coors relating to whether Coors' attempts to terminate the distribution agreements are unlawful

pursuant to Section 55-c, and whether Sanzone and Salamanca have rights under Section 55-c

relating to Molson Products.

48.     In the Arbitrations, Coors asserts that the agreements between Coors and Sanzone

and Salamanca can be terminated pursuant to Section 55-c(2)(e)(i)(A) for "good cause" based

upon the fact that Coors, as assignee of Molson USA's rights under the distribution agreements,

has decided to pursue Molson USA's national plan of consolidation ("Molson USA's

Consolidation Policy").

49.     Section 55-c(2)(e)(i)(A) defines "good cause" as follows:

> "Good cause" means and shall be limited to:
> (i)(A) The implementation by a brewer of a national or regional
> policy of consolidation which is reasonable, nondiscriminatory and
> essential. Such policy shall have been previously disclosed, in
> writing, in reasonable detail to the brewer's wholesalers, and shall
> result in a contemporaneous reduction in the number of a brewer's
> wholesalers not only for a brand in this state, but also for a brand
> in contiguous states or in a majority of the states in which the
> brewer sells the brand. All affected wholesalers and affected
> brewers shall be afforded ninety days prior notice of the
> implementation of such policy, and such notice shall be provided
> by the brewer implementing said policy. Further, an affected
> wholesaler who has actual knowledge of the intended
> implementation of such policy shall also notify each affected
> brewer. The term "affected brewers" means all other brewers with
> an agreement with an affected wholesaler who is a multiple brands
> wholesaler. The term "affected wholesalers" means wholesalers
> who may reasonably be expected to experience a loss or

diminishment of a right to distribute a brand, in whole or in part, as a consequence of a proposed consolidation policy.

50.    In order for a consolidation policy to qualify as grounds for good cause for the termination of a New York distributor, a brewer seeking to terminate bears the burden of demonstrating that its policy meets the following objective requirements: (1) the consolidation policy will be implemented on a national or regional level; (2) the policy is reasonable, (3) the policy is essential to the brewer; (4) the policy is non-discriminatory; and (5) the brewer's implementation of the consolidation policy, if "regional, " will result in a contemporaneous reduction of the number of distributors for its brand both in New York, as well as in the states contiguous to New York, or if "national" the brewer's implementation of the consolidation policy will result in a contemporaneous reduction of the number of distributors for its brand both in New York, as well as in a majority of states in which the brewer's brand is sold.

51.    In addition, Section 55-c requires that the brewer shall previously disclose the policy of consolidation, in writing, in reasonable detail, to the brewer's wholesalers.

52.    While Coors is apparently attempting to adopt the Molson USA Consolidation Policy, Coors, in the Arbitrations, has failed to allege that Coors has adopted a policy of consolidation. Neither has Coors alleged that (1) the Molson USA Consolidation Policy will be implemented by Coors on a national level; (2) the Molson USA Consolidation Policy is reasonable with respect to Coors; (3) the Molson USA Consolidation Policy is essential to Coors; (4) as implemented by Coors, the Molson USA Consolidation Policy is non-discriminatory; or that (5) Coors' implementation of the Molson USA Consolidation Policy will result in a contemporaneous reduction of the number of distributors for its brand both in New York, as well as in a majority of states in which the Molson brand is sold.

53.    Moreover, Coors fails to assert that Coors provided Plaintiff with the required

notice disclosing in detail the consolidation policy.

54.     To support its position that it can terminate Plaintiffs, Coors completely relies upon an arbitration award issued in favor of Molson USA (a different brewer), against a different New York distributor, John G. Ryan, Inc., wherein the arbitrator found that portions of the statute were unconstitutional and as a result, Molson USA's Consolidation Policy satisfied the requirements of Section 55-c as it related to Molson USA's business (the "Ryan Award").

55.     The Ryan Award, while not binding legal precedent in any event, fails to support Coors' position that it can terminate Sanzone and Salamanca based upon Molson USA's Consolidation Policy because the Ryan Award analyzed Molson USA's Consolidation Policy as it related specifically to the business operations of Molson USA, not Coors.

56.     The Ryan Award does not hold that (1) Molson USA's Consolidation Policy was implemented by Coors on a national level; (2) the Molson USA Consolidation Policy is reasonable to Coors; (3) the Molson USA Consolidation Policy is essential to Coors; (4) the Molson USA Consolidation Policy is non-discriminatory; or that (5) Coors' implementation of the Molson USA Consolidation Policy will result in a contemporaneous reduction of the number of distributors for its brand both in New York, as well as in a majority of states in which the Molson brand is sold.

57.     As of this date, there has been no decision that is entitled to precedential value to the effect that either the Molson USA Consolidation Policy satisfied the requirements of §55-c with respect to its business or the Molson USA Consolidation Policy is reasonable, non-discriminatory and essential to Coors' business operations.

58.     Sanzone and Salamanca assert that Molson USA's Consolidation Policy is not reasonable, non-discriminatory or essential to Coors and that it violates Section 55-c and is not

grounds for a "good cause" termination of the distributor agreements.

59.    Coors is a brewer and seller of Coors brand products (the "Coors Brands") and Coors' business focuses primarily on the production, marketing and distribution of the Coors Brands, including its flagship brand Coors Light.

60.    Upon information and belief, the marketing and distributing of Molson products by Coors represents a miniscule percentage of Coors' total business.

61.    Thus, because the marketing and distribution of the Molson products represents such an exceedingly minor portion of Coors' business, Coors cannot establish that the implementation of Molson USA's Consolidation Policy by Coors is reasonable, non-discriminatory or essential to Coors' business.

62.    Based upon the above, Sanzone and Salamanca assert that Coors may not terminate their distributor agreements because Coors has not acted with the requisite "good faith" required under the statute.

63.    In addition, Coors has failed to provide Plaintiffs with the statutory notice of its consolidation policy as required by Section 55-c.

64.    In order to prevent immediate adverse legal consequence to Sanzone and Salamanca, a declaration is necessary that (i) Coors' attempt to terminate its distributor agreements with Sanzone and Salamanca is unlawful because Coors does not have a basis under Section 55-c to terminate the agreements between Coors and Sanzone and Salamanca regarding Sanzone's and Salamanca's distribution rights of the Molson products; and (ii) Coors must recognize and honor Sanzone's and Salamanca's exclusive distribution rights to the Molson products in their respective exclusive territories and must perform under its agreements with Sanzone and Salamanca.

65.     By reason of the foregoing, Sanzone and Salamanca are entitled to a declaration

pursuant to 28 U.S.C. §2201 and Fed. R. Civ. P. 57 that (i) Coors' attempt to terminate its

distributor agreements with Sanzone and Salamanca is unlawful because Coors does not have a

basis under Section 55-c to terminate the agreements between Coors and Sanzone and Salamanca

regarding Sanzone's and Salamanca's distribution rights of the Molson products; and (ii) Coors

must recognize and honor Sanzone's and Salamanca's exclusive distribution rights to the Molson

products in their respective exclusive territories and must perform under its agreements with

Sanzone and Salamanca.

**SECOND CLAIM FOR RELIEF**
**(Permanent Injunction)**

66.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through

60 as if more fully set forth at length herein.

67.     Pursuant to Section 4 of the Federal Arbitration Act, a court has the concomitant

power to enjoin an arbitration proceeding where the parties have not agreed to binding arbitration

or where such provision is not enforceable.

68.     Coors' wrongfully asserts that Sanzone and Salamanca have agreed to binding

arbitration pursuant to the Molson Amendment.

69.     Although the Molson Amendment purports to grant Coors the right to commence

binding arbitration, Molson USA did not have statutory "good cause" to modify Plaintiffs' prior

distribution agreements (which contained no arbitration provisions) and thus, the arbitration

provisions contained in the Molson Amendment are not enforceable.

70.     Even if the Molson Amendment is enforceable, the arbitration provisions

contained in that agreement are not enforceable because the Molson Amendment specifically

incorporates New York law and explicitly provides that conflicts are decided in favor of New

York law.

71.      The provisions of Section 55-c conflict with the pre-dispute arbitration clause
contained in the Molson Amendment because Section 55-c (i) prohibits mandatory pre-dispute
arbitration clauses; (ii) gives wholesalers the right to commence an action in the event of a
breach by a brewer; and (iii) prevents brewers from requiring wholesalers to waive their rights.

72.      If the Molson Amendment is enforceable, the Arbitrations are nevertheless barred
because Molson failed to commence the Arbitration within the limitation period (one year)
contained within the Molson Amendment.

73.      The pre-dispute arbitration clause is unenforceable because it violates the express
public policy of New York.

74.      Finally, because Coors, in the Arbitrations, is seeking to declare various
provisions of New York law unconstitutional, arbitration is not the appropriate forum for this
dispute.

75.      As a result of Coors' improper commencement of Arbitrations against Sanzone &
Salamanca, both Sanzone and Salamanca will suffer irreparable harm.

76.      By reason of the foregoing, in order to remedy the effect of Coors' improper
conduct, Sanzone and Salamanca are entitled to a permanent injunction enjoining Coors from
continuing the Arbitrations against Sanzone and Salamanca.

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(a)   a declaration pursuant to 28 U.S.C. §2201 and Fed. R. Civ. P. 57 that (i) Coors'
attempt to terminate its distributor agreements with Sanzone and Salamanca is unlawful
because Coors does not have a basis under Section 55-c to terminate the agreements between
Coors and Sanzone and Salamanca regarding Sanzone's and Salamanca's distribution rights

of the Molson beer products; and (ii) Coors must recognize and honor Sanzone's and

Salamanca's exclusive distribution rights to the Molson beer products in the Exclusive

Territory and must perform under its agreements with Sanzone and Salamanca.

    (b)  a permanent injunction enjoining Coors from continuing the Arbitrations against

Sanzone and Salamanca.

    (c)  granting Plaintiffs their costs and attorney's fees; and

    (d)  such other and further relief as this Court deems just and proper.

Dated: Garden City, New York
       January 10, 2008

                    ETTELMAN & HOCHHEISER, P.C.

                    By:_____
                        Gary Ettelman (GE 9315)
                    Attorneys for Plaintiff
                    100 Quentin Roosevelt Blvd., Suite 401
                    Garden City, New York 11530
                    (516) 227-6300

# EXHIBIT B



**MARTLET IMPORTING CO. INC.**

Sole Importers of Molson Beer & Ale

3333 New Hyde Park Road
North Hills, New York 11042
(516) 365-6300

June 17, 1986

Mr. Wayne Monauan
Sanzone Dist. Co., INc.
9396 River Rod. - Rt. 49
Marcy, NY  13403

Dear Mr. Monauan:

Due to several requests for distribution of your area of
primary responsibility, we have reviewed all the areas
in the Northern New York district.  Attached you will find
your area of primary responsibility for Molson products.

Sincerely,

Patrick J. Sullivan/cs

Patrick J. Sullivan
General Manager,
Eastern Region

516
27
6307

PJS:cas
cc:  Rocky Mantella

attachment

N.Y.S.L.A. LICENSE NO. C193⁻ˀ•  IMPORT LICENSE NO. NY-1-478

DISTRIBUTOR NAME:   SANZONE DIST. CO., INC., MARCY, NEW YORK

AREA OF PRIMARY RESPONSIBILITY

All of Oneida County

All of Herkermer County

01/04/2008 17:03 FAX 3154630666    SPIRIT & SANZONE                    ☑004



**MARTLET IMPORTING CO. INC.**

Sole Importers of Molson Beer & Ale

3333 New Hyde Park Road
North Hills, New York 11042
(516) 365-6300

June 17, 1986

Mr. Francis Sanzone
Sanzone Dist. Co.
233 North Main Street
Gloversville, NY  12078

Dear Mr. Sanzone:

Due to several requests for distribution of your area of
primary responsibility, we have reviewed all the areas
in the Northern New York district.  Attached you will find
your area of primary responsibility for Molson products.

Sincerely,

Patrick J. Sullivan

Patrick J. Sullivan
General Manager,
Eastern Region

PJS:cas
cc:  Rocky Mantella

attachment

DISTRIBUTOR NAME:    SANZONE DIST. CO.; GLOVERSVILLE, NEW YORK

AREA OF PRIMARY RESPONSIBILITY

All of Montgomery County

"     " Fulton County

"     " Scoharie County

Southern half of Hamilton County

**EXHIBIT C**



October 28, 2002

Francis S. Sanzone
Spirit & Sanzone Distributors Co., Inc. - 330140
P.O. Box 696
East Syracuse, NY 13057

Dear Mr. Sanzone:

As you know, effective January 2, 2001, Coors Brewing Company assumed sales and
distribution responsibilities of the new joint venture between Coors and Molson in the United
States. As part of the arrangement, your distribution agreement with Molson was assigned
to the new joint venture and you executed a five-year Amendment to your existing
agreement.

Molson is now offering you the enclosed new Distributorship Agreement to replace your
existing Distributorship Agreement (i.e., the Martlet Importing Co., Inc., Distributor
Agreement) and the Molson Amendment to Distributor Agreement. This new Agreement is
being offered to Molson distributors in an effort to promote a uniform basis for the fair
administration of Molson's distributor relationships. *Our offer of this new Agreement does
not reflect a change to previous communication regarding consolidation for your market.*

In the event that you do not sign the new Molson Distributorship Agreement, the enclosed
Distributor Standards, as referenced in the Molson Amendment to Distributor Agreement,
are still applicable. Also, the Amendment provides that annually Molson may review and
update the Distributor Standards to ensure they are consistent with changes in the industry
and internal Molson business practices.

The Distributor Standards were developed after several months of assessment and we also
solicited input from Molson distributors to make sure requirements are reasonable and
focused on the key business issues. These Distributor Standards represent an integral part
of your contractual relationship with Molson and we encourage you to acquaint your
organization with them.

Please sign and return the enclosed Molson Distributorship Agreement and the "Distributor
Standards Acknowledgment" to the address indicated by November 27, 2002. If you do not
want to enter into the new Molson Agreement, we are still requesting signature and return of
the Distributor Standards Acknowledgment.

If you have any questions, feel free to call jo Ann Rodriquez (303-277-5380).

Sincerely,

David Perkins
President

pc: Vinny Prattico - Tim Owston - Geoff Molson - Vito Culmone - Bill Beyer - RVPs - AVPs - FODs - Molson DBMs - WDDs

**EXHIBIT D**

MARTLET IMPORTING CO. INC.
DISTRIBUTOR AGREEMENT

Martlet Importing Co. Inc. ("Importer"), agrees to sell and the undersigned Distributor agrees to buy and market those products listed on the Distributor Data Sheet attached hereto, pursuant to the following terms and conditions:

1.     Distributor's Representations.

Distributor represents and warrants that:

(a)     The information submitted to Importer in Distributor's application, if such application was requested previously by Importer, including any marketing plans, and the information on the Distributor Data Sheet (which shall have been completed and signed by Distributor at the time this Agreement is executed) is true and complete.

(b)     Distributor has all permits and licenses necessary for Distributor lawfully to distribute Importer products in Distributor's Area as defined in Paragraph 2(a) below.

(c)     Distributor has not paid nor agreed to pay any fee or monetary consideration or anything of value to Importer or to or for the benefit of any Importer officer, director, employee or representative with respect to the issuance of this Agreement.

In reliance on the above representations and warranties, Importer enters into this Agreement with Distributor.

2.     Distributor's Area.

(a)     Importer hereby appoints Distributor as its sole distributor within the geographic areas described in the Distributor Data Sheet ("Distributor's Area") for the Importer products listed in the Distributor Data Sheet ("Importer products"). It is understood that the Distributor's Area may be different for different Importer products. Unless Importer has granted its prior written approval, Distributor shall not sell or supply Importer products to any retail location within another authorized Importer distributor's area nor to any person Distributor has reason to believe will sell or supply all or part of such products to any retail location within another authorized Importer distributor's area. Nothing in this subparagraph shall prevent Distributor from selling or supplying Importer products to another authorized Importer distributor for the purpose of eliminating product shortages or inventory imbalances.

(b)     The following provisions, rather than the provisions of subparagraph (a), shall apply whenever any of the provisions of subparagraph (a) are expressly prohibited by any final court order or precluded by any applicable statute or regulation:

Importer hereby appoints Distributor as a distributor within the geographic area described in the Distributor Data Sheet ("Distributor's Area") for the Importer products listed in the Distributor Data Sheet ("Importer products"). Distributor's primary responsibility shall be to promote and sell Importer products to retail locations in Distributor's Area. If Distributor sells or supplies Importer products to retail locations outside Distributor's Area or to any person (other than an authorized Importer distributor) who Distributor has reason to believe will sell or supply all or part of such products to retail locations outside Distributor's Area, Distributor's obligations under Paragraph 4 of this Agreement shall extend to each such retail location. Distributor shall notify Importer immediately of all such sales in order to ensure effective monitoring of Distributor's compliance with all such obligations.

(c)    Except as otherwise specifically agreed to in writing by Importer, the grant of rights to Distributor shall not allow, and Distributor is prohibited from selling or supplying any Importer product to an exporter, embassy, foreign-bound carrier, duty-free store or ship chandler, and in no event shall Distributor sell or supply Importer products to anyone Distributor has reason to believe intends to sell, distribute or resell such products outside of the United States. Importer reserves the right to sell to such persons directly or through commissioned agents or other persons or entities.

3.    Management of Distributor.

(a)    Distributor agrees to have at all times a Manager approved by Importer who shall manage Distributor's business and vigorously promote and sell Importer products in accordance with this Agreement. The Manager shall be designated on the Distributor Data Sheet.

(b)    Distributor may at its sole discretion terminate the employment of the Manager.

4.    Operation of Distributor.

(a)    Distributor shall sell Importer products only to retailers and other persons to whom Distributor is duly licensed to sell such products and shall otherwise comply with all valid laws, regulations and orders applicable to the sale of Importer products. Distributor shall maintain all permits and licenses necessary to distribute Importer products in Distributor's Area. Distributor shall submit to Importer upon the request of Importer copies of all such permits and licenses, subsequent amendments thereto, renewals thereof, and all applications for such permits, licenses, amendments or renewals.

(b)    Distributor shall aggressively market and promote the sale of the full package line of Importer products listed on the Distributor Data Sheet. Distributor shall submit marketing plans to Importer upon Importer's request. Distributor shall use its best efforts to comply fully with any marketing plans and other commitments submitted by Distributor to Importer, shall adjust such plans from time to time to meet changing market conditions, and shall monitor the marketing activity of competing products. Unless Importer shall otherwise specify in writing, (i) Distributor shall follow a sales program that classifies accounts based on competitive volume surveys and establishes a sufficient frequency of calls to the retail accounts based upon the sales potential of each account, and (ii) Distributor shall utilize route books and maintain records that reflect sales made by Distributor to individual retail locations.

(c)    Distributor shall maintain a balanced on-floor inventory at a level prescribed from time to time by Importer for the full package line of Importer products listed on the Distributor Data Sheet.

(d)    Distributor shall take all necessary actions to ensure the quality control of Importer products in compliance with Importer's Quality Control Standards. Those actions shall include, but not be limited to:

(i)    observance of Importer's code-date requirements;

(ii)    proper stock rotation in the warehouse, vehicles and retail locations;

(iii)    proper handling and protection from damage of all Importer products, containers and dunnage;

(iv)    sales of Importer products solely out of inventory in Distributor's warehouse and on an oldest code-date-first basis, unless Importer shall otherwise approve in writing;

(v)    maintenance of clean, operational warehouse(s) and;

(vi)    implementation of a program in Distributor's Area for: (a) preventing Importer products bearing expired code dates ("overage products") from reaching consumers, (b) retrieving overage Importer products from retail locations, (c) replacing such products with fresh Importer products at no cost to the retailer and (d) destroying promptly any damaged or overage Importer products at no cost to Importer unless the overage or damaged condition was Importer's responsibility.

(e)    Distributor shall preserve and enhance the high quality image, reputation and goodwill of Importer and Importer's products.

(f)    Distributor shall maintain complete and accurate records of orders and deliveries from Importer, as well as sales and inventory records, and Importer shall have access to such records.

(g)    Distributor shall provide regular delivery of Importer products with sufficient frequency to be competitive with other competition.

(h)    Distributor shall ensure the safe and proper handling, storage, placement and installation of Importer point-of-sale materials, shall display such materials in a conspicuous place wherever possible at each retail location, and shall maintain records pertaining to their use.

(i)    Upon receipt of written notice from Importer, Distributor shall discontinue any advertising or promotional practices that Importer finds injurious to Importer's image or business or Importer products.

(j)    Distributor shall purchase and maintain sufficient insurance coverage, shall pay all federal, state, and local taxes imposed on it and shall use its best efforts to discharge promptly all debts incurred in the operation of its business.

(k)    Distributor shall comply with other provisions of this Agreement and shall observe all such other requirements as Importer may reasonably impose from time to time for the effective marketing of Importer products.

5.    Agreement Term.

The Agreement shall commence on the date it becomes effective and shall remain in effect until terminated as described below.

6.    Ownership of Distributor.

There shall be no change in the control of Distributor's business unless Distributor shall have obtained Importer's prior written approval. As used herein "a change in control of Distributor's business" means any change in ownership interests, whether by one transaction or by the cumulative effect of several transactions with the same or different parties, which has the legal or practical effect of transferring the power to determine the Distributor's business policies. Such change in control shall include, but not be limited to, any sale, transfer, change of ownership or other disposition in either the record or beneficial ownership of the following: (i) 10 percent or more of the voting stock; (ii) if Distributor is not incorporated, a 10 percent or more interest in Distributor's business; (iii) 10 percent or more voting stock of the corporation which owns 50

percent or more of Distributor's voting stock; and (iv) a change in the form of business entity presently used by Distributor (e.g. a change from individual ownership or a partnership to a corporation). Without Importer's prior written approval, there shall be no grant of stock options, establishment of trusts to hold stock in Distributor's business, nor execution of any agreements by one or more owners of Distributor which provides that, under certain circumstances, the interest of one of them in Distributor shall be sold or purchased by one or more of the owners. It shall be Distributor's responsibility to notify all of the owners of Distributor of the provisions of this subparagraph and to notify Importer promptly in writing of any sale, transfer, change of ownership or other disposition of an ownership interest in Distributor.

7.     Distributor's Termination Rights.

        Distributor shall have the right to terminate this Agreement at any time by giving Importer at least ninety (90) days' prior written notice. In such event, Importer's sole obligation to Distributor shall be the purchase of Distributor's Inventory pursuant to Paragraph 9(c) below. If Distributor ceases business operations with respect to Importer products, Distributor shall be considered to have terminated this Agreement, effective as of the date operations cease.

8.     Importer's Termination Rights.

        (a)     Importer shall have the right to terminate this Agreement at any time by giving Distributor at least ninety (90) days' prior written notice.

        (b)     Without waiving its rights under Paragraph 8(a), Importer shall have the right to terminate this Agreement if there is a default, breach or failure of the Distributor to comply with or perform any of the Agreement provisions, terms, obligations, warranties, covenants or representations, which is not cured (i) within thirty (30) days after notice is given to Distributor of such condition; or (ii) within such longer notice and cure period as may be required by the then applicable law.

        (c)     If any of the following events occur, Importer shall have the right to terminate this Agreement immediately upon the giving of written notice or after such longer period of notice as may be required under the then applicable law:

        (i)     Conviction of Distributor, the Manager or any of Distributor's owners of a felony;

        (ii)     Distributor's fraudulent conduct or substantial misrepresentation in any of its dealing with Importer or with others concerning Importer's products.

        (iii)     Revocation or suspension of any of Distributor's federal, state or local licenses or permits for more than thirty-one (31) days, if such license or permit is required for the normal operation of Distributor's business;

        (iv)     Distributor's insolvency or failure to pay monies due Importer in accordance with the terms of sale established by Importer;

        (v)     Any disposition of Distributor's business, change of control, or attempt to assign this Agreement in contravention to the terms of the Agreement;

        (vi)     Distributor's violation of the provisions of Paragraph 2 of this Agreement; and

(vii)    Importer no longer has the right to sell the Importer products in Distributor's Area.

(d)    Importer shall have the right to terminate this Agreement at any time by giving Distributor thirty (30) days' written notice, provided that Importer contemporaneously gives such notice to all other Distributors located in the state or states in which the Distributor's Area is located, who have executed this form of Agreement. Importer shall incur no liability to Distributor by reason of such termination. In the event Importer exercises its right under this subparagraph and offers such other distributors the right to enter into a new agreement, Importer shall offer Distributor the right to enter into a new agreement upon substantially similar terms and conditions.

## 9.    Post-Termination Provisions.

In the event this Agreement is terminated, the following provisions shall apply:

(a)    Importer shall have the right to cancel unfilled orders and to stop or re-route any shipment en route to Distributor.

(b)    Within ten (10) days after such termination, Distributor shall return to Importer all property belonging to Importer in Distributor's possession or control. Importer shall not be liable to Distributor for any expenses incurred by Distributor in connection with such property. If Distributor has placed a deposit with Importer on any such property, Importer shall refund such deposit to Distributor or credit an equivalent amount to Distributor's account when such property is returned in the same condition in which it was delivered by Importer to Distributor, reasonable wear and tear expected.

(c)    Within ten (10) days after such termination, Distributor shall sell and Importer shall purchase Distributor's inventory of Importer products purchased after the date of this Agreement, F.O.B. Distributor's location and free and clear of all liens and encumbrances, at a repurchase price equal to the sum of the following:  the net price actually paid by Distributor to Importer for the inventory, plus the amount of any taxes paid by Distributor in connection with purchasing the inventory from Importer, plus the cost of transporting the inventory from Importer to Distributor's warehouse (minus any freight charges that Distributor would have incurred in returning empty returnable containers to Importer), plus a handling charge to be set from time to time by Importer. In lieu of paying such repurchase price, Importer may, at its election, credit the equivalent amount to Distributor's account.

(d)    In no event with regard to a termination of this Agreement shall Importer be liable to Distributor for any special, indirect, incidental or consequential damages, nor shall Importer become liable to Distributor for any other loss, damage, expense, or investment of any kind whatsoever incurred as a result of the relationship contemplated by this Agreement.

## 10.    Terms of Sale.

(a)    The prices charged by Importer to Distributor shall be the prices established by Importer in effect on the date of shipment. Importer shall inform Distributor of its prices in writing from time to time.

(b)    All sales by Importer to Distributor shall be on a cash basis or on such credit terms as Importer, in its sole discretion, may establish from time to time. Importer shall not be obliged to extend credit to Distributor to assist Distributor in securing credit. Regardless of the method of payment, Importer shall retain a security interest in products and containers delivered to Distributor

until Importer receives full payment of all monies owed to Importer. Upon Importer's request, Distributor shall execute such documents as are reasonable or necessary to perfect Importer's security interest.

     (c)    All products and containers which are sold to Distributor shall be sold F.O.B. that warehouse or brewery designated by Importer. If a sight draft bill of lading is used, title and risk of loss shall pass to Distributor when Importer delivers the product to the carrier for shipment to the Distributor.

     (d)    All kegs and dunnage shall remain the property of Importer and shall be returned to Importer in accordance with Importer's instructions.

     (e)    Distributor shall be responsible for all federal, state and local sales, use, personal property, inventory and other taxes that may be assessed against Distributor on any Importer products or other Importer property in Distributor's possession at the time such tax is assessed or determined. Distributor shall also be responsible for any local, state and federal excise taxes on the shipment of Importer products to Distributor to the extent that such excise taxes are not included in Importer's prices.

## 11.    Financial Planning and Reporting

     (a)    Distributor shall furnish to Importer annually one hundred and twenty (120) days after the end of Distributor's fiscal year, year ending operating and financial statements (including income statements and balance sheets). All such statements shall be truthful and prepared with generally accepted accounting principles

     (b)    Importer shall have the right, after appropriate notice and at reasonable intervals, to inspect Distributor's financial, accounting, sales and inventory records.

     (c)    Any financial data obtained by Importer pursuant to this Paragraph shall be treated by Importer and its employees as confidential information and shall not be disclosed to any other party without Distributor's written consent, unless such disclosure is compelled by a court or governmental agency and Importer has provided prior written notice of such disclosure to Distributor.

## 12.    Rights Reserved to Importer.

     (a)    All orders for Importer products placed by Distributor shall be subject to Importer's acceptance. Importer shall have the right to specify the forms and procedures governing the placement of such orders, including, but not limited to, the routing to be used for delivery of such orders as are accepted. In the event that Importer is restricted in the production, sale or delivery of its products by capacity limitations, acts of governmental authority, strikes or any other cause, natural or otherwise, beyond Importer's control, Importer shall not be compelled to honor previously accepted orders, but shall distribute available products among distributors in a fair and equitable manner.

     (b)    Importer reserves the unqualified right to manage and conduct its business in all respects and shall be free at all times to maintain or alter the formula, ingredients, labelling or packaging of the Importer products; to determine the prices and other terms on which it sells Importer products; to produce or sell any particular brands; and to discontinue the sale of any of its products, packages or containers in any geographic area.

13.    Importer Trade Designation.

(a)    Distributor hereby acknowledges Importer's exclusive ownership, license rights and/or other rights in the various trademarks, trade names, service marks, trade dress and other trade designations (collectively "trade designations") relating to Importer's business or Importer's products. Importer hereby grants Distributor a nonexclusive, non-assignable, non-licensable privilege to use Importer trade designations only in a lawful manner and in connection with the distribution, advertising, display and sale of Importer products. This privilege shall terminate upon termination of this Agreement. Such trade designations shall be used only in manners, forms and contexts specified or approved in writing by Importer, and upon Importer's request. Distributor shall discontinue the way in which Distributor uses any Importer trade designation. Distributor agrees that it shall not manufacture or have manufactured any merchandise bearing such designations without Importer's prior written approval.

(b)    Distributor agrees to remove all Importer trade designations affixed in any fashion to property owned or controlled by Distributor (including vehicles, equipment and office supplies) before leasing, selling or otherwise transferring such property or control thereof to another person or before putting such property to any use not connected with the distribution of Importer products.

14.    Assignments.

Any transfer, sale, assignment or delegation of this Agreement or of any rights or obligations under this Agreement by Distributor, in whole or in part, whether by operation of law or otherwise, shall be null and void, unless Importer has given its prior written approval. Nothing herein shall prevent Importer from assigning all or part of its rights or obligations under this Agreement.

15.    New Importer Products.

This Agreement shall extend only to the brands of Importer products listed on the Distributor Data Sheet. Importer and Distributor may at any time agree in writing to extend this Agreement to other Importer products, in which case the names of such other products shall be entered on the Distributor Data Sheet, provided Importer at its sole discretion reserves the right not to offer any other Importer product to Distributor (including, but not limited to, line extensions).

16.    Amendments to Agreement.

(a)    Importer may at any time propose an amendment to this Agreement. Distributor shall indicate its acceptance of any such amendment by returning two (2) executed copies thereof to Importer. The amendment shall become effective on the date executed by Importer, who shall retain one (1) executed copy of the amendment and shall return the other executed copy to Distributor. If Distributor does not return an executed amendment to Importer within ninety (90) days after the proposed amendment is submitted to Distributor, this Agreement shall immediately terminate without liability to either party.

(b)    The provisions of subparagraph (a) shall not apply to changes made by Importer to the Distributor Data Sheet, and Importer specifically reserves the right to delete, modify or change any Importer product described in the Distributor Data Sheet without Distributor's consent or approval. Distributor shall notify Importer immediately of any changes applicable to it. Except as otherwise provided in this Agreement, no change in the Distributor Data Sheet by one party shall alter the other party's rights or obligations hereunder, unless the other party shall have given its prior written approval.

17.    Compliance with Law, Venue.

(a)    The illegality or unenforceability of any provision of this Agreement shall not impair the legality or enforceability of any other provision. The laws, rules and regulations of the jurisdiction in which Distributor conducts its business are hereby incorporated in this Agreement to the extent that such laws, rules and regulations are required to be so incorporated and shall supersede any conflicting provision of this Agreement. If required by applicable law, Importer and Distributor may enter into an amendment of this Agreement for the sole purpose of complying with such law.

(b)    Any action, claim, suit or proceeding between Importer and Distributor, including, but limited to, those connected with, arising out of or related to this Agreement or which in any way involves the relationship between Importer and Distributor, whether in contract, tort or statute, shall be initiated and prosecuted as to all parties and their successors and assigns solely and exclusively in the United States District Court for the Eastern District, Alexandria Division, State of Virginia, and each party waives, freely and completely, any right to dismiss and/or transfer any action pursuant to 28 U.S.C. §§   1404 or 1406, and any successor statute. In the event said District Court does not have subject matter jurisdiction of said matter, then such matters shall be solely and exclusively under the jurisdiction of the appropriate state court of competent jurisdiction located in Fairfax County, Virginia. The parties consent to in personam jurisdiction of the herein described courts.

18.    Notice.

All notices that are required or permitted to be given under this Agreement shall be in writing, duly signed by the party giving such notice, shall be transmitted either by personal delivery, by telecopy or by registered or certified mail, with return receipt and postage prepaid, and, depending upon the means of transmittal, shall be effective when delivered, telecopied or mailed. All telecopied notices shall also require a copy to also be mailed, postage prepaid to the addressee. Notices shall be addressed:   (i) if to Distributor to the address of Distributor set forth after Distributor's signature to this Agreement or (ii) if to Importer, to 11911 Freedom Drive, Suite 1100, Reston, Virginia  22090-5609. Telecopies shall be sent to the number described in the Distributor Data Sheet and to Importer at such number as Importer shall designate. The address or telecopy number of either party may be changed by notice to the other party given pursuant to this Paragraph.

19.    Miscellaneous Provisions.

(a)    "Prior written approval" as used in this Agreement requires a communication signed by a corporate officer of Importer.

(b)    "Authorized Importer distributor" as used in this Agreement shall mean a distributor who is party to a written distributor agreement with Importer which is currently in effect.

(c)    No representation, promise, inducement or statement of intention other than those set forth in this Agreement and the attached Distributor Data Sheet as referred to in Paragraph 1(a) or 4(b) of this Agreement has been made by Importer or Distributor and neither party shall be bound by or liable for any other alleged representation, promise, inducement or statement of intention. Upon this Agreement becoming effective as defined in Paragraph 5, all previous agreements and understandings, whether oral or written, between Distributor and Importer or the predecessor, parent and affiliate of Importer are hereby terminated and Distributor releases Importer and Importer's predecessor, parent and affiliate from any and all obligations or liabilities under such previous agreements and understandings, provided that Distributor shall remain obligated to pay any amounts due under such previous agreements or understandings. This Agreement contains the entire understanding between the parties with regard to the subject matter contained herein.

(d)      The failure of either Importer or Distributor at any time or times to enforce any provision of this Agreement shall in no way be construed as a waiver of such provision and shall not affect the right of that party at a later time to enforce each and every such provision.

(e)      Except as specifically provided for in this Agreement, no person, including any officer, agent or employee of Importer, has any authority to amend, modify, waive, supersede or cancel this Agreement or any terms or provisions of this Agreement. No conduct of any such person shall be construed to create that authority.

(f)      Distributor acknowledges that it is, and shall remain, an independent business entity. Importer and Distributor are not joint venturers or partners, and neither may act as the agent, employee or fiduciary of the other.

## 20.    ACKNOWLEDGMENTS

The undersigned, in their personal or representative capacities, acknowledge that they have read this Agreement in full and have had an opportunity to review it with counsel; that they understand and agree to each of the foregoing provisions; and that they are duly authorized to sign the Agreement.

This Agreement is effective on the ____ day of _____ __, ___.

_____
(Sole Proprietorship, Partnership, Corporation)*

By

_____(SEAL)
(Owner, Partner, President)*
By

_____(SEAL)
(Partner, Secretary)
By

_____(SEAL)
(Partner)
By

_____(SEAL)
(Partner)

CORPORATE
SEAL

**Martlet Importing Co. Inc.**

By _____
(Title)  Vice President

*Delete inapplicable words beneath signature lines. In the case of a partnership, all partners must sign.

9

**EXHIBIT E**

# AMENDMENT TO DISTRIBUTOR AGREEMENT

THIS AGREEMENT ("Agreement") is entered into and made effective this 2nd day of January, 2001 by and between Molson 2000, LLC, a Limited Liability Company with its principal place of business in Bloomfield Hills, Michigan ("Company"), and **Spirit & Sanzone Distributors Co., Inc.** , a _____Corporation_____ , with its principal place of business in East Syracuse, NY ("Distributor"), hereafter referred to together as "the parties."

## RECITALS

A.    The Company has acquired the right to import and sell Molson malt beverage products ("Importer Products") in the United States of America.

B.    Distributor has been a distributor of Importer Products in a specific territory for the Company's predecessor importer pursuant to a Martlet distributor agreement ("the Prior Martlet Agreement"), a Molson distributor agreement ("the Prior Molson Agreement"), a letter of appointment or some other form of distributor agreement with the predecessor importer to the Company (any of which shall be referred to as a "Prior Agreement").

C.    It is the desire of the parties to amend any prior distribution agreement as described below.

## AGREEMENT

NOW THEREFORE, in consideration of the covenants and promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    <u>Agreement, Assignment and Release.</u>

1.1.    If Distributor is a party to a Prior Martlet Agreement or a Prior Molson Agreement, Distributor agrees to the assignment of such prior agreement to the Company, as amended by this Agreement, for those Importer Products distributed by Distributor.

1.2.    If Distributor is a party to a letter of appointment, some other form of distributor agreement or if Distributor has no written agreement, Distributor agrees to the terms of the Prior Molson



Agreement attached hereto as Exhibit A, as amended by this Agreement, for those Importer Products distributed by Distributor.

1.3. Distributor hereby releases all claims against all parties to the Prior Martlet Agreement, Prior Molson Agreement, letter of appointment or other form of distributor agreement and releases each of the following entities and each of their respective affiliates from all such claims relating to the existing distribution relationship: Miller Brewing Company, Foster's Brewing Group (USA), Fosters Brewing Group Limited, Molson USA, LLC [now known as Foster's USA, LLC], Molson Canada, Molson 2000, LLC, Molson Inc., Rathon Corp., and Martlet Importing Co., Inc.

2. Sales and Logistics Management. Company has retained Coors Brewing Company ("Coors") to facilitate the sales and distribution of Importer Products under this Agreement and the assigned agreements. Distributor will:

2.1. Market and sell Importer Products in cooperation with the promotions, programs and policies of Coors;

2.2. Comply with Coors beer ordering system, billing system (EFT), sales reporting system and other Coors information reporting systems;

2.3. Comply with the Company's procedures for shipment, delivery or pick-up of the Importer Products.

3. Distributor Standards. The term "Quality Control Standards" in Paragraph 4 (d) of the Prior Martlet Agreement and the quality control and operations standards referred to in Paragraph 4(d) of the Prior Molson Agreement shall now refer to the Molson Distributor Standards Manual as hereafter formulated and amended from time to time by the Company.

4. Additional Distributor Duties. Distributor shall:

4.1. Achieve such reasonable performance goals as Coors and Company, with input from Distributor, may establish for Distributor from time to time and communicate in writing to Distributor.

2

4.2.   Maintain wholesale inventories at levels recommended by Coors and Company.

4.3.   Provide accurate and timely Product forecasts to the Company and Coors.

5.   Termination. For five years from the date of this Agreement, Company will not terminate the Prior Agreement and this Agreement except for the events of default defined in paragraphs 8(b) and 8(c) of the applicable Prior Martlet Agreement or paragraphs 9(b) or 9(c) of the applicable Prior Molson Agreement, in each case as amended by this Agreement. Paragraph 8(c) of the applicable Prior Martlet Agreement and paragraph 9(c) of the applicable Prior Molson Agreement are amended to add the following:

5.1.   Intentional conduct by the managers or employees of Distributor in permitting the sale of Importer Products outside the quality standards set forth in the Molson Distributor Standards Manual.

5.2.   If as a result of a transaction involving Distributor's business or as a result of action by one or more of Distributor's other suppliers, Distributor's revenues from beer products will be reduced by 25% or more.

6.   Dispute Resolution. Paragraph 17(b) of the applicable Prior Martlet Agreement or paragraph 18(b) of the applicable Prior Molson Agreement is deleted and the following substituted therefor:

6.1.   Except as set forth below, if any dispute between Distributor and the Company shall occur, including without limitation a dispute as to whether the Company has grounds to terminate this Agreement, such dispute shall be submitted by Distributor for informal mediation ("Mediation") of the dispute by the president of the Company (or his designee) within 30 days of the date the dispute shall first arise. The Company, but not Distributor, shall be bound by the decision of the mediator concerning the dispute. Mediation shall be a condition precedent to Distributor's right to pursue any other remedy available under this Agreement or otherwise available under law. The Company shall not be required to mediate any claim against Distributor for nonpayment of Distributor's outstanding account.

6.2.   Any and all disputes between Distributor and the Company or its agent, Coors, except nonpayment of Distributor's account,

3

including without limitation a dispute as to whether the Company has grounds to terminate this Agreement, which disputes are not resolved by Mediation, shall be submitted to binding arbitration in the city nearest to Distributor in which there is a regional office of the American Arbitration Association, before a single arbitrator, in accordance with the Commercial Arbitration Rules and procedures of the American Arbitration Association. Any and all disputes shall be submitted to arbitration hereunder within one year from the date the dispute first arose or shall be forever barred. Arbitration hereunder shall be in lieu of all other remedies and procedures, provided that either party hereto may seek preliminary injunctive relief prior to the commencement of such Arbitration proceedings.

7. <u>Notice</u>. Notices to the Company shall be sent to:

> Molson 2000, LLC
> C/O Coors Brewing Company
> Distributor Services, NH 511
> 17735 West 32nd Avenue
> Golden, Colorado 80401-0030

THIS AGREEMENT is executed by Distributor on the _____ day of _____, ____, effective as of the 2nd day of January, 2001.

Spirit & Sanzone Distributors Co., Inc.

By: _____
Francis S. Sanzone

THIS AGREEMENT is executed by the Company on the _29_ day of _January_, _2001_, effective as of the 2nd day of January, 2001.

Molson 2000, LLC

By: _____
General Manager

4



## Exhibit A

## MOLSON USA, LLC
## DISTRIBUTOR AGREEMENT

MOLSON USA, LLC ("Molson") agrees to sell and the undersigned Distributor agrees to buy and market those products listed on the Distributor Data Sheet attached hereto, pursuant to the following terms and conditions:

1.  Distributor's Representations.

Distributor represents and warrants that:

    a.  Distributor has all permits and licenses necessary for Distributor to lawfully distribute Products in Distributor's Area as defined in Paragraph 2 below.

    b.  Distributor has not paid nor agreed to pay any fee or monetary consideration or anything of value to Molson or for the benefit of any Molson officer, director, employee or representative with respect to the issuance of this Agreement.

In reliance on the above representations and warranties, Molson enters into this Agreement with Distributor.

2.  Distributor's Area.

    a.  Molson hereby appoints Distributor as its sole distributor within the geographic area described in the Distributor Data Sheet ("Distributor's Area") for the products listed in the Distributor Data Sheet ("Products"). It is understood that the Distributor's Area may be different for different Products. Unless Molson has granted its prior written approval, Distributor shall not sell or supply Products to any retail location within another authorized distributor's area nor to any person Distributor has reason to believe will sell or supply all or part of such Products to any retail location within another authorized distributor's area. Nothing in this subparagraph shall prevent Distributor from selling or supplying Products to another authorized Molson distributor for the purpose of eliminating Product shortages or inventory imbalances.

    b.  The following provisions, rather than the provisions of subparagraph (a) above, shall apply whenever any of the provisions of subparagraph (a) above are expressly prohibited by any final court order or precluded by any applicable statute or regulation:

Molson hereby appoints Distributor as a distributor within the geographic area described in the Distributor Data Sheet ("Distributor's Area") for the products listed in the Distributor Data Sheet ("Products"). Distributor's primary responsibility shall be to comply with the Distributor obligations in accordance with this Agreement with respect to retail locations in Distributor's Area. If Distributor sells or supplies Products to retail locations outside Distributor's Area or to any person (other than an authorized Molson or Miller distributor) who Distributor has reason to believe will sell or supply all or part of such Products to retail locations

outside Distributor's Area, Distributor's obligations under Paragraph 4 of this Agreement shall extend to each such retail location. Distributor shall notify Molson immediately of all such sales in order to ensure effective monitoring of Distributor's compliance with all such obligations.

         c.       Except as otherwise specifically agreed to in writing by Molson, the grant of rights to Distributor shall not allow, and Distributor is prohibited from selling or supplying any Product to an exporter, embassy, foreign-bound carrier, duty-free store or ship chandler, and in no event shall Distributor sell or supply Products to anyone Distributor has reason to believe intends to sell, distribute or resell such Products outside of the United States. Molson reserves the right to sell to such persons directly or through commissioned agents or other persons or entities.

       3.      <u>Management of Distributor.</u>

         a.       Distributor agrees to have at all times a Manager approved by Molson who shall manage Distributor's business and vigorously promote and sell Products in accordance with this Agreement. The Manager shall be designated on the Distributor Data Sheet.

         b.       The Manager shall be qualified to perform all functions and duties necessary to manage Distributor's business and to comply with Distributor's obligations pursuant to this Agreement. The Manager shall be granted the authority by Distributor and shall exercise day-to-day operating control over the business and finances of Distributor, including implementation of the Business Plan.

         c.       Distributor may at its sole discretion terminate the employment of the Manager.

         d.       Molson may withdraw its approval of a Manager if Distributor or the Manager fails to comply with the provisions of subparagraph (b) above.

         e.       Distributor shall notify Molson in writing if the Manager becomes unable or ceases to manage Distributor's business, no later than ten (10) days from the occurrence of such event. Within sixty (60) days after Distributor ceases for any reason to have a Manager, Distributor shall submit to Molson a written application in the form provided by Molson requesting Molson's approval of a properly qualified candidate selected by Distributor for the then vacant Manager position. Molson shall be provided with all information reasonably related to the candidate's qualifications to serve as the Manager and shall have the right to interview the candidate.

         f.       Within forty-five (45) days after the date of receipt of Distributor's application for a new Manager, Molson shall notify Distributor of Molson's approval or disapproval of the proposed Manager, such approval by Molson shall not be unreasonably withheld. If Molson does not approve the proposed Manager, Distributor shall submit another application within sixty (60) days and the procedures described herein shall be repeated as often as necessary, provided that if a Manager is not approved within one hundred eighty (180) days after a vacancy has occurred, Molson shall have the right to terminate this Agreement in accordance with the procedures described in Paragraph 9(c). Any changes in the identity of the Manager shall be entered on the Distributor Data Sheet.

4.    Operation of Distributor.

    a.    Distributor shall sell Products only to retailers and other persons to whom Distributor is duly licensed to sell such Products and shall otherwise comply with all valid laws, regulations and orders applicable to the sale of Products. Distributor shall maintain all permits and licenses necessary to distribute Products in Distributor's Area. Distributor shall submit to Molson, upon the request of Molson, copies of all such permits and licenses, subsequent amendments thereto, renewals thereof, and all applications for such permits, licenses, amendments or renewals.

    b.    Distributor shall, by using its best efforts, vigorously and aggressively market and promote the sale of the full package line of Products in Distributor's Area. Distributor shall submit marketing plans to Molson upon Molson's request. Distributor shall use its best efforts to comply fully with any marketing plans and other commitments submitted by Distributor, shall adjust such plans from time to time to meet changing market conditions, and shall monitor the marketing activity of competing products. Unless Molson shall otherwise specify in writing: (i) Distributor shall follow a sales program that classifies accounts based on competitive volume surveys and establishes a sufficient frequency of calls to the retail accounts based upon the sales potential of each account; and (ii) Distributor shall utilize route books and maintain records that reflect sales made by Distributor to individual retail locations.

    c.    Distributor shall maintain a balanced on-floor inventory at a level prescribed from time to time by Molson for the full package line of Products.

    d.    Distributor shall take all necessary actions to ensure the quality control of Products in compliance with Molson's quality control and operations standards which are in effect from time to time. Those actions shall include, but not be limited to:

    (1)    Observance of Molson's code-date requirements;

    (2)    Proper stock rotation in the warehouse, vehicles and retail locations;

    (3)    Proper handling and protection from damage of all Products, containers and dunnage;

    (4)    Sales of Products solely out of inventory in Distributor's warehouse and on an oldest code-date-first basis, unless Molson shall otherwise approve in writing;

    (5)    Maintenance of clean, operational warehouse(s);

    (6)    Effective June 1, 2001:

    (a)    Packaged Products shall be stored in a controlled temperature warehouse that is maintained between 38°F and 70°F;

    (b)    Kegs of Product shall be stored in coolers that are set to maintain a temperature range of 36°F to 40°F, with the ideal temperature of 38°F; and

-3-

(c)    Warehouse temperatures must be monitored routinely and appropriate records of warehouse temperatures are to be maintained for periodic random evaluation by Molson personnel.

(7)    Implementation of a program in Distributor's Area for: (a) preventing Products bearing expired code-dates ("Overage Products") from reaching consumers; (b) retrieving Overage Products from retail locations; (c) replacing such products with fresh Products at no cost to the retailer; and (d) destroying promptly any damaged or Overage Products at no cost to Molson unless the overage or damaged condition was Molson's responsibility.

e.    Distributor shall preserve and enhance the high quality image, reputation and goodwill of Molson and Products.

f.    Distributor shall maintain complete and accurate records of orders and deliveries from Molson, as well as sales and inventory records, and Molson shall have access to such records. Distributor shall submit only complete and accurate notices, reports, claims, reimbursement requests, or other communications to Molson. Records for all transactions including all price promotion allowance programs instituted by Molson, shall be maintained by Distributor for a minimum of three (3) years or as prescribed by state law, whichever is longer. Molson shall have the right to audit all such records. For any Molson price promotion allowance program, Distributor shall be required to file forms prescribed by Molson from time to time. Molson may audit any reimbursement claims filed by Distributor. In the event Molson finds errors greater than One Thousand Dollars ($1,000.00), or such other dollar amount set by Molson from time to time, Molson may calculate the percentage rate of error and using that percentage rate of error, extrapolate the amount owed to Molson for up to the prior three (3) years total reimbursement claims made by Distributor to Molson. Molson shall notify Distributor of the extrapolated audit results. Within thirty (30) days of such notice, Distributor must either pay the extrapolated amount to Molson or pay for the cost of a full audit by Molson or Molson's designee. Molson reserves the right to enforce other appropriate remedies, including those described in Paragraph 9 below.

g.    Distributor shall be open for business during all hours and days necessary to receive Products and to properly service retailers, including hours necessary to provide regular delivery of Products with sufficient frequency to prevent retailer out-of-stock occurrences, and maintain a qualified workforce of employees who are properly trained and adequately compensated to aggressively market and promote the Products.

h.    Distributor shall procure and distribute, and shall ensure the safe and proper handling, storage, placement and installation of Molson point-of-sale materials. Distributor shall display such materials in a conspicuous place at each retail location, and shall maintain records pertaining to their use. All such activities shall be as more particularly specified by Molson from time to time.

i.    Upon receipt of written notice from Molson, Distributor shall discontinue any advertising or promotional practices that Molson finds injurious to Molson's image or business or Products.

-4-



      j.     Distributor shall purchase and maintain sufficient insurance coverage, shall pay all federal, state, and local taxes imposed on it, and shall use its best efforts to discharge promptly all debts incurred in the operation of its business.

      k.     Distributor shall obtain and maintain the capability as may be specified from time to time by Molson to communicate electronically with Molson (e.g., by use of the Internet with required software) and Distributor shall use such communications as may also be specified from time to time by Molson. Distributor shall purchase and maintain electronic information systems software that is century date compliant and that is capable of: (i) electronic commerce with suppliers and retail customers; (ii) providing invoice level data to Molson; (iii) providing retail account classifications as designated by Molson; (iv) providing retail outlet locations (geocodes); (v) providing inventory status by SKU and by warehouse; and (vi) providing pricing information to Molson including front-line, promotional discounts, extended discounts and volume account discounts.

      l.     Distributor shall: (i) submit a monthly Distributor forecast at the brand/package/alcohol level, and the aggregate of these forecasts for each reporting month must be within +/- 5% of current six month actual sales trends; (ii) have a route accounting system that is century date compliant; and (iii) maintain accurate and up-to-date account information, including properly identified account and volume classifications, account profiles, sales and distribution and geocodes as requested by Molson.

      m.     Distributor shall maintain and submit the following information for a specified period, by a certain time, and in the appropriate form and media (manual or electronic) as requested by Molson: (i) sales information at the retail account invoice level and in summary form; (ii) account information; (iii) distribution information at the retail account level and in summary form; (iv) inventory and in-transit and forecast information; and (v) front-line, promotional, and retail pricing.

      n.     Distributor shall prepare and submit to Molson, by January 1 of each calendar year, an annual business plan in a form and content acceptable to Molson ("Business Plan"), which shall include: (i) an executive summary; (ii) sales goals (annual and by month for total business and key channels); (iii) distribution goals (annual and by month for total business and key channels); (iv) retail service policy; and (v) sales and merchandising execution standards. Distributor and Manager shall implement the approved Business Plan, including preparation and implementation of detailed monthly sales plans, to achieve the goals established therein, comply fully with the Business Plan and other commitments made to Molson, and consult with Molson on adjustments to the Business Plan that may be needed from time to time to meet changing market conditions.

      o.     Distributor shall maintain a minimum sales call frequency: (i) in off-premise accounts of twice per week in all accounts which comprise the top 20% of the industry volume in Distributor's Area and once a week in all other off-premise accounts; and (ii) in on-premise accounts of once a week in all accounts which comprise the top 50% of industry volume in Distributor's Area.

      p.     Distributor is responsible for maintaining focus on the Products and directing appropriate resources to support the Products. Therefore, direction by Distributor to



the employees and resources utilized to sell, merchandise and market the Products shall be equal to or greater than that percentage of volume that the Products represent to the total volume of fermented malt beverages sold by Distributor. The employee sales commission (whether structured on a per case or per unit basis or on a percentage basis) for Distributor and supplier (or combined) funded commissions for any Product will be equal to or greater than that commission offered on a similar/like competitor product marketed or sold by Distributor.

q.     At least every twelve (12) months during the term of this Agreement, Distributor will conduct a retail satisfaction survey that measures Distributor service in relation to the competition. The results of the survey will be submitted to Molson and opportunities identified will be addressed in the subsequent Business Plans.

r.     Distributor shall comply with other provisions of this Agreement and shall observe all such other requirements as Molson may reasonably impose from time to time for the vigorous and aggressive marketing of Products.

5.     Agreement Term.

This Agreement shall commence on the date it becomes effective and shall remain in effect until terminated as described below.

6.     Ownership of Distributor.

a.     The prior written approval of Molson shall not be required for the sale, transfer or disposition of Distributor's business or any ownership interest therein to a family member, provided that: (i) such sale, transfer or disposition does not cause a substantial adverse financial effect on the business or operations of Distributor; and (ii) upon such sale, transfer or disposition, Distributor shall have a Manager approved by Molson. Any subsequent change in control of Distributor's business, as defined in Paragraph 5(b) below, shall require Molson's prior written approval, including the sale, transfer or disposition to a trust for the benefit of a family member. Family member is defined as the owner's spouse, child, grandchild, parent, brother or sister who is entitled to inherit the deceased owner's ownership interest under the terms of the deceased owner's will or the laws of intestate succession.

b.     Except as provided in Paragraph 6(a), there shall be no change in the control of Distributor's business unless Distributor shall have obtained Molson's prior written approval. As used herein, "a change in control of Distributor's business" means any change in ownership interests, whether by one transaction or by the cumulative effect of several transactions with the same or different parties, which has the legal or practical effect of transferring the power to determine the Distributor's business policies. Such change in control shall include, but not be limited to, (a) any sale, transfer, change of ownership or other disposition in either the record or beneficial ownership of the following: (i) 10% or more of Distributor's voting stock; (ii) if Distributor is not incorporated, a 10% or more interest in Distributor's business; (iii) 10% or more voting stock of the corporation or entity which owns 50% or more of Distributor's voting stock; and (b) a change in the form of business entity presently used by Distributor (e.g., a change from individual ownership or a partnership to a corporation); and (c) the entering into or changing of any agreement transferring any of the powers to determine the policies under which Distributor's business shall be operated, including

-6-



a partner, shareholder, or member voting trust or voting agreement. Without Molson's prior written approval, there shall be no grant of stock options, establishment of trusts to hold stock in Distributor's business, nor execution of any agreements by one or more owners of Distributor which provides that, under certain circumstances, the interest of one of them in Distributor shall be sold or purchased by one or more of the owners. It shall be Distributor's responsibility to notify all of the owners of Distributor of the provisions of this Paragraph and to notify Molson promptly in writing of any sale, transfer, change of ownership or other disposition of an ownership interest in Distributor.

7.    Transfer of Distributor's Business.

Distributor shall have the right to sell, transfer or dispose of ("Convey") its entire business or any part of its business to an approved purchaser, except when such disposition results in the sale, transfer or disposition ("Transfer") of Distributor's rights or obligations under this Agreement, or results in the inability of Distributor to fulfill its obligations under this Agreement, in which event Distributor shall follow the procedures and comply with the conditions as set forth in this Paragraph.

a.    Prior to any such Transfer, Distributor shall deliver to Molson a bona fide nonbinding letter of intent negotiated on an arm's length basis duly executed by Distributor and the proposed purchaser, which letter of intent shall be expressly made subject to Molson's rights described in this Paragraph and shall set forth all of the essential terms of the transaction, including the property subject to the Transfer; the consideration to be paid; the representations and warranties to be given by Distributor; and all other material terms and conditions which would be contained in a definitive purchase and sale agreement. Such letter of intent and a distributor application completed by the proposed purchaser shall be submitted to Molson within five (5) days after execution by Distributor of the letter of intent.

b.    Upon receipt of the letter of intent, Molson shall have (during Distributor's normal business hours) access to and the right to inspect Distributor's business and its books and records, including its financial statements, appraisals, environment assessments, assets and liabilities, and Distributor shall cooperate in providing such data and information that Molson may reasonably request.

c.    Upon receipt of the letter of intent, Molson shall have the irrevocable right and option to purchase Distributor's business or that part thereof which is the subject of the letter of intent upon those terms and conditions and for the purchase price (or, if such purchase price is not a liquidated cash price, for the equivalent cash value) contained in such letter of intent. Such terms and conditions shall be contained in a purchase and sale agreement to be duly executed by Distributor and Molson, if Molson exercises its right and option. Molson shall have thirty (30) days after receipt of the letter of intent and the information Molson may reasonably request (including appraisals and environmental assessments requested or commissioned by Molson) to exercise its right and option, which exercise shall occur when written notice is given to Distributor. If Molson exercises its right and option, Distributor shall promptly execute all documents reasonably required to Convey Distributor's business or part thereof to Molson.

d.    If Molson does not exercise its right and option described in subparagraph (c) above, and Distributor has complied with all terms in subparagraph (c) above, Molson shall

-7-

have sixty (60) days from receipt of the completed distributor application to approve or disapprove the proposed purchaser and transaction. Distributor may Convey its business in accordance with the letter of intent subject to Molson's prior written approval of the proposed purchaser, which approval shall not be unreasonably withheld, and the purchaser's execution of the current form of this Agreement applicable to other authorized Molson distributors upon completion of the Transfer. Molson's approval (if given) shall be effective for a period of sixty (60) days after issuance (unless extended by Molson) and thereafter shall be null and void. Distributor shall promptly notify Molson of the completion of the Transfer. Molson shall notify Distributor in writing if Molson disapproves the proposed purchaser. The notice will include the reasons for the disapproval. If Molson disapproves the proposed purchaser, Distributor shall not Convey its rights under this Agreement or render itself unable to fulfill its obligations hereunder unless and until it obtains Molson's approval as described in this Paragraph.

e. As part of the completion of the Transfer described in this Paragraph: (i) Distributor shall pay all sums owed or to be owing to Molson; and (ii) Distributor and Molson shall execute a mutual release of all claims, of whatever nature, each party may have against the other, except where such claims may arise out of or result from a breach or default of any representation, warranty, covenant, agreement or obligation by Distributor that may be contained in the purchase and sale agreement entered into with Molson.

f. Molson may designate a third party who shall upon such designation be granted all of the rights and obligations granted to Molson under subparagraphs (a) through (c) above, provided that the mutual release described in subparagraph (e) above shall be entered into between Molson and Distributor.

**8.** Distributor's Termination Rights.

Distributor shall have the right to terminate this Agreement at any time by giving Molson at least ninety (90) days' prior written notice. In such event, Molson's sole obligation to Distributor shall be the purchase of Distributor's inventory pursuant to Paragraph 10(c) below. If Distributor ceases business operations with respect to Products, Distributor shall be considered to have terminated this Agreement, effective as of the date operations cease.

**9.** Molson's Termination Rights.

a. Molson shall have the right to terminate this Agreement at any time by giving Distributor at least ninety (90) days' prior written notice.

b. Without waiving its rights under subparagraph (a) above, Molson shall have the right to terminate this Agreement if there is a default, breach or failure of the Distributor to comply with or perform any of the Agreement provisions, terms, obligations, warranties, covenants or representations, which is not cured: (i) within thirty (30) days after notice is given to Distributor of such condition; or (ii) within such longer notice and cure period as may be required by the then applicable law.

c. If any of the following events occur, Molson shall have the right to terminate this Agreement immediately upon the giving of written notice or after such longer period of notice as may be required under the then applicable law.

-8-

  
        (1)     Conviction of Distributor, the Manager or any of Distributor's owners of a felony;

        (2)     Distributor's fraudulent conduct or substantial misrepresentation in any of its dealings with Molson or with others concerning Products;

        (3)     Revocation or suspension of any of Distributor's federal, state or local licenses or permits for more than thirty-one (31) days, if such license or permit is required for the normal operation of Distributor's business;

        (4)     Distributor's insolvency or failure to pay monies due Molson in accordance with the terms of sale established by Molson;

        (5)     Any disposition of Distributor's business, change of control, or attempt to assign this Agreement in contravention to the terms of the Agreement;

        (6)     Distributor's violation of the provisions of Paragraph 2 of this Agreement;

        (7)     Distributor's failure to obtain Molson's prior written approval of a Manager within the time period described in Paragraph 3(f);

        (8)     Molson no longer has the right to sell Products in Distributor's Area; and

        (9)     Molson is enjoined from selling Products to Distributor.

        d.     Molson shall have the right to terminate this Agreement at any time by giving Distributor thirty (30) days' written notice, provided that Molson contemporaneously gives such notice to all other Distributors located in the state or states in which the Distributor's Area is located, who also have an agreement for servicing the Products. Molson shall incur no liability to Distributor by reason of such termination. In the event Molson exercises its right under this Paragraph and offers other distributors the right to enter into a new agreement or include the Products on an existing agreement, Molson shall offer Distributor the right to enter into a new agreement upon substantially similar terms and conditions.

        e.     If Molson terminates this Agreement in accordance with the terms of subparagraph (a) above, Molson or its designee shall pay Distributor the lesser of: (i) the net gross profit earned by Distributor from the bona fide sale of Products during the twelve-month period immediately prior to termination ("Termination Year") multiplied by the fraction the numerator of which is the Termination Year net gross profit and the denominator is the net gross profit earned by Distributor from the bona fide sale of Products during the twelve-month period immediately prior to the beginning of the Termination Year; or (ii) the net gross profit earned by Distributor for the bona fide sale of Products during the Termination Year. For purposes hereof, "net gross profit" shall mean the period, less all costs of goods sold including the cost of deposits, spoilage, price promotions, Product purchases and taxes and less any credits, discounts or rebates received as a result of such sold Products. Such payments shall only be paid to

-9-



Distributor if Distributor executes a full release of all claims, of whatever nature, Distributor may have against Molson.

10.    Post-Termination Provisions.

In the event this Agreement is terminated, the following provisions shall apply:

a.    Molson shall have the right to cancel unfilled orders and to stop or re-route any shipment en route to Distributor.

b.    Within ten (10) days after such termination, Distributor shall return to Molson all property belonging to Molson in Distributor's possession or control. Molson shall not be liable to Distributor for any expenses incurred by Distributor in connection with such property. If Distributor has placed a deposit with Molson on any such property, Molson shall refund such deposit to Distributor or credit an equivalent amount to Distributor's account when such property is returned in the same condition in which it was delivered by Molson to Distributor, reasonable wear and tear expected.

c.    Within ten (10) days after such termination, Distributor shall sell and Molson shall purchase Distributor's inventory of Products purchased after the date of this Agreement, F.O.B. Distributor's location and free and clear of all liens and encumbrances, at a repurchase price equal to the sum of the following: the net price actually paid by Distributor to Molson for the inventory, plus the amount of any taxes paid by Distributor in connection with purchasing the inventory from Molson, plus the cost of transporting the inventory from Molson to Distributor's warehouse (minus any freight charges that Distributor would have incurred in returning empty returnable containers to Molson), plus a handling charge to be set from time to time by Molson. In lieu of paying such repurchase price, Molson may, at its election, credit and offset the equivalent amount to Distributor's account.

d.    Molson shall have the right to terminate this Agreement at any time by giving Distributor thirty (30) days' written notice, provided that Molson contemporaneously gives such notice to all other Distributors located in the state or states in which the Distributor's Area is located, who also have an agreement for servicing the Products. Molson shall incur no liability to Distributor by reason of such termination. In the event Molson exercises its right under this Paragraph and offers other distributors the right to enter into a new agreement or include the Products on an existing agreement, Molson shall offer Distributor the right to enter into a new agreement upon substantially similar terms and conditions.

e.    If Molson terminates this Agreement in accordance with the terms of subparagraph (a) above, Molson or its designee shall pay Distributor the lesser of: (i) the net gross profit earned by Distributor from the bona fide sale of Products during the twelve-month period immediately prior to termination ("Termination Year") multiplied by the fraction the numerator of which is the Termination Year net gross profit and the denominator is the net gross profit earned by Distributor from the bona fide sale of Products during the twelve-month period immediately prior to the beginning of the Termination Year; or (ii) the net gross profit earned by Distributor for the bona fide sale of Products during the Termination Year. For purposes hereof, "net gross profit" shall mean the proceeds realized from the sale of Products during the most recently ended twelve-month period, less all costs of goods sold including the cost of deposits,

spoilage, price promotions, Product purchases and taxes and less any credits, discounts or rebates received as a result of such sold Products. Such payments shall only be paid to Distributor if Distributor executes a full release of all claims, of whatever nature, Distributor may have against Molson.

10. Post-Termination Provisions.

In the event this Agreement is terminated, the following provisions shall apply:

a. Molson shall have the right to cancel unfilled orders and to stop or re-route any shipment en route to Distributor.

b. Within ten (10) days after such termination, Distributor shall return to Molson all property belonging to Molson in Distributor's possession or control. Molson shall not be liable to Distributor for any expenses incurred by Distributor in connection with such property. If Distributor has placed a deposit with Molson on any such property, Molson shall refund such deposit to Distributor or credit an equivalent amount to Distributor's account when such property is returned in the same condition in which it was delivered by Molson to Distributor, reasonable wear and tear expected.

c. Within ten (10) days after such termination, Distributor shall sell and Molson shall purchase Distributor's inventory of Products purchased after the date of this Agreement, F.O.B. Distributor's location and free and clear of all liens and encumbrances, at a repurchase price equal to the sum of the following: the net price actually paid by Distributor to Molson for the inventory, plus the amount of any taxes paid by Distributor in connection with purchasing the inventory from Molson, plus the cost of transporting the inventory from Molson to Distributor's warehouse (minus any freight charges that Distributor would have incurred in returning empty returnable containers to Molson), plus a handling charge to be set from time to time by Molson. In lieu of paying such repurchase price, Molson may, at its election, credit and offset the equivalent amount to Distributor's account.

d. In no event with regard to a termination of this Agreement shall Molson be liable to Distributor for any special, indirect, incidental or consequential damages, nor shall Molson become liable to Distributor for any other loss, damage, expense, or investment of any kind whatsoever incurred as a result of the relationship contemplated by this Agreement.

11. Terms of Sale.

a. The prices charged by Molson to Distributor shall be the prices established by Molson in effect on the date of shipment.

b. All sales by Molson to Distributor shall be on a cash basis or on such other terms of sale as Molson, in its sole discretion, may establish from time to time. Molson shall not be obliged to extend credit to Distributor or to assist Distributor in securing credit. Regardless of the method of payment, Molson shall retain a security interest in Products and containers delivered to Distributor until Molson receives full payment of all monies owed to Molson, unless Distributor has delivered to Molson an irrevocable letter of credit from a financial institution, in an amount, and in a form and content acceptable to Molson. Upon Molson's request, Distributor

shall execute such documents as are reasonable or necessary to perfect Molson's security interest. Except as may otherwise be requested by Molson, Distributor shall submit payments to Molson in accordance with electronic funds transfer protocol and terms as Molson may establish from time to time.

        c.     All kegs, computer software, dunnage and other assets owned by Molson shall remain the property of Molson and shall be returned to Molson in accordance with Molson's instructions.

        d.     Distributor shall be responsible for all federal, state and local sales, use, personal property, inventory and other taxes that may be assessed against Distributor on any Products or other Molson property in Distributor's possession at the time such tax is assessed or determined. Distributor shall also be responsible for any local, state and federal excise taxes on the shipment of Products to Distributor to the extent that such excise taxes are not included in Molson's prices.

      12.    <u>Financial Planning and Reporting.</u>

        a.     Distributor shall furnish to Molson upon the execution of this Agreement and thereafter annually within one hundred and twenty (120) days after the end of Distributor's fiscal year, year ending operating and financial statements (including income statements, statements of cash flow, and balance sheets in a manner and format acceptable to Molson). All such statements shall be truthful and prepared with generally accepted accounting principles.

        b.     Molson shall have the right, after appropriate notice and at reasonable intervals, to inspect Distributor's financial, accounting, sales and inventory records.

        c.     Any financial data obtained by Molson pursuant to this Paragraph shall be treated by Molson and its employees as confidential information and shall not be disclosed to any other party without Distributor's written consent, unless such disclosure is compelled by a court or governmental agency and Molson has provided prior written notice of such disclosure to Distributor.

      13.    <u>Rights Reserved to Molson.</u>

        a.     All orders for Products placed by Distributor shall be subject to Molson's acceptance. Molson shall have the right to specify the forms, procedures and processes (including electronic ordering systems) governing the placement and payment of such orders, including, the designation of the carrier, source, and the routing to be used for delivery of such accepted orders. In the event that Molson is restricted in the importation, sale or delivery of its Products by capacity limitations, acts of governmental authority, strikes or any other cause, natural or otherwise, beyond Molson's control, Molson shall not be compelled to honor previously accepted orders, but shall distribute available Products among distributors in a fair and equitable manner.

        b.     Molson reserves the unqualified right to manage and conduct its business in all respects and shall be free at all times to maintain or alter the formula, ingredients, labeling or packaging of the Products; to determine the prices and other terms on which it sells Products;

to produce or sell any particular brands; and to discontinue the sale of any of its Products, packages or containers in any geographic area.

14.   Molson Trade Designation.

a.   Distributor hereby acknowledges Molson's exclusive ownership, license rights and/or other rights in the various trademarks, trade names, service marks, trade dress and other trade designations (collectively "Trade Designations") relating to Molson's business or Products. Molson hereby grants Distributor a nonexclusive, non-assignable, non-licensable privilege to use Molson Trade Designations only in a lawful manner and in connection with the distribution, advertising, display and sale of Products. This privilege shall terminate upon termination of this Agreement. Such Trade Designations shall be used only in manners, forms and contexts specified or approved in writing by Molson, and upon Molson's request, Distributor shall discontinue the way in which Distributor uses any Molson Trade Designation. Distributor agrees that it shall not manufacture or have manufactured any merchandise bearing such Trade Designations without Molson's prior written approval.

b.   Distributor agrees to remove all Molson Trade Designations affixed in any fashion to property owned or controlled by Distributor (including vehicles, equipment and office supplies) before leasing, selling or otherwise transferring such property or control thereof to another person or before putting such property to any use not connected with the distribution of Products.

15.   Assignments.

Except as provided in Paragraph 6(a), any transfer, sale, assignment or delegation of this Agreement or of any rights or obligations under this Agreement by Distributor, in whole or in part, whether by operation of law or otherwise, shall be null and void, unless Molson has given its prior written approval. Nothing herein shall prevent Molson from assigning all or part of its rights or obligations under this Agreement.

16.   New Molson Products.

This Agreement shall extend only to the brands of Products listed on the Distributor Data Sheet. Molson and Distributor may at any time agree in writing to extend this Agreement to other products, in which case the names of such other products shall be entered on the Distributor Data Sheet, provided Molson at its sole discretion reserves the right not to offer any other Molson product to Distributor.

17.   Amendments to Agreement.

a.   Molson may at any time propose an amendment to this Agreement if such amendment is applicable to all other distributors located in the state or states in which the Distributor's Area is located who also have an agreement for servicing the Products. Distributor shall indicate its acceptance of any such amendment by returning two (2) executed copies thereof to Molson. The amendment shall become effective on the date executed by Molson, who shall retain one (1) executed copy of the amendment and shall return the other executed copy to Distributor. If Distributor does not return an executed amendment to Molson within ninety (90)

-13-

days after the proposed amendment is submitted to Distributor, this Agreement shall immediately terminate without liability to either party.

      b.     The provisions of subparagraph (a) above shall not apply to changes made by Molson to the Distributor Data Sheet that are specifically permitted in this Agreement. Distributor shall notify Molson immediately of any changes applicable to it. Except as otherwise provided in this Agreement, no change in the Distributor Data Sheet by one party shall alter the other party's rights or obligations hereunder, unless the other party shall have given its prior written approval.

### 18.   Compliance with Law, Venue.

      a.     The illegality or unenforceability of any provision of this Agreement shall not impair the legality or enforceability of any other provision. The laws, rules and regulations of the jurisdiction in which Distributor conducts its business are hereby incorporated in this Agreement to the extent that such laws, rules and regulations are required to be so incorporated and shall supersede any conflicting provision of this Agreement. If required by applicable law, Molson and Distributor may enter into an amendment of this Agreement for the sole purpose of complying with such law.

      b.     Any action, claim, suit or proceeding between Molson and Distributor or any owners of Distributor, whether based on federal, state statutory or common law, including but not limited to, any and all disputes relating to, arising out of or in connection with the interpretation, performance or nonperformance of this Agreement and any and all disputes arising out of or in connection with transactions in any way related to this Agreement (including the termination of this Agreement) shall be litigated solely and exclusively before the United States District Court whose district includes the location of Distributor's principal place of business. The parties consent to the in personam jurisdiction of said court for the purposes of any such litigation and waive, fully and completely, any right to dismiss and/or transfer any action pursuant to 28 U.S.C. Section 1404 or 1406 (or any successor statutes) or the doctrine of forum non conveniens. In the event the United States District Court does not have subject matter jurisdiction of said matter, then such matters shall be litigated solely and exclusively before the appropriate state court of competent jurisdiction located in the municipality or district where Distributor's principal place of business is located, and the parties consent to the personal jurisdiction of such courts for the purpose of such litigation.

      c.     Molson, Distributor and the owners of Distributor waive any right to trial by jury with respect to any claim or action relating to or arising from this Agreement or any action or omission of any signatory hereto (or its subsidiaries or affiliates) in connection with the transactions contemplated by this Agreement.

### 19.   Notice.

     All notices that are required or permitted to be given under this Agreement shall be in writing, duly signed by the party giving such notice, shall be transmitted either by personal delivery, by telecopy or by registered or certified mail, with return receipt and postage prepaid, and, depending upon the means of transmittal, shall be effective when delivered, telecopied or mailed. All telecopied notices shall also require a copy to also be mailed, postage prepaid to the

addressee. Notices shall be addressed: (a) if to Distributor to the address of Distributor set forth after Distributor's signature to this Agreement; or (b) if to Molson, to 3939 West Highland Boulevard, Milwaukee, Wisconsin 53208. Telecopies shall be sent to the number described in the Distributor Data Sheet and to Molson at such number as Molson shall designate. The address or telecopy number of either party may be changed by notice to the other party given pursuant to this Paragraph.

20.  Miscellaneous Provisions.

a.  "Prior written approval" as used in this Agreement requires a communication signed by a corporate officer of Molson.

b.  "Authorized Molson distributor" as used in this Agreement shall mean a distributor who is party to a written distributor agreement with Molson for Products which is currently in effect.

c.  No representation, promise, inducement or statement of intention other than those set forth in this Agreement and the attached Distributor Data Sheet has been made by Molson or Distributor and neither party shall be bound by or liable for any other alleged representation, promise, inducement or statement of intention. Upon this Agreement becoming effective as defined in Paragraph 5, all previous agreements and understandings, whether oral or written, between Distributor and Molson, Martlet Importing Co., Inc. or Century Importers, Inc., parent and affiliates of Molson and the predecessor owner of the Products are hereby terminated. Distributor releases owner of the Products, and their respective parent and affiliates from any and all obligations or liabilities under such previous agreements and understandings, provided that Distributor shall remain obligated to pay any amounts due under such previous agreements or understandings. This Agreement contains the entire understanding between the parties with regard to the subject matter contained herein.

d.  The failure of either Molson or Distributor at any time or times to enforce any provision of this Agreement shall in no way be construed as a waiver of such provision and shall not affect the right of that party at a later time to enforce each and every such provision.

e.  Except as specifically provided for in this Agreement, no person, including any officer, agent or employee of Molson, has any authority to amend, modify, waive, supersede or cancel this Agreement or any terms or provisions of this Agreement. No conduct of any such person shall be construed to create that authority.

f.  Distributor acknowledges that it is, and shall remain, an independent business entity. Molson and Distributor are not joint venturers or partners, and neither may act as the agent, employee or fiduciary of the other.

21.  Acknowledgements.

The undersigned, in their personal or representative capacities, acknowledge that they have read this Agreement in full and have had an opportunity to review it with counsel; that they understand and agree to each of the foregoing provisions; and that they are duly authorized to sign the Agreement.

-15-

This Agreement is effective on the ___ day of _____, _____.

_____
Name of Distributor
(Sole Proprietorship, Partnership, Corporation, L.L.C.*)

By:_____(SEAL)
      (Owner, Member, Partner, President)

CORPORATE
SEAL

By:_____(SEAL)
      (Owner, Member, Partner, Secretary)

By:_____(SEAL)
      (Owner, Member, Partner)

By:_____(SEAL)
      (Owner, Member, Partner)

MOLSON USA, LLC

By:_____

Title:_____

CORPORATE
SEAL

By:_____

Title:_____

-16-

12/31/2007 18:33 FAX 3154630666    SPIRIT & SANZONE    ☒028

12/31/2007 10:52:18 AM  Case 1:08-cv-00251-LES  Church, Kim M  Foley & Lardner LLP  Page 27
Document 11-2  Filed 01/24/2008  Page 55 of 63





## EXHIBIT A

## PRODUCT PORTFOLIO and MARKET AREA

East Syracuse, NY

According to our records, the following constitutes Distributor's authorized Products and Market Area.

### MARKET AREA

In the State of New York:

All of Cortland, Fulton, Herkimer, Madison, Montgomery, Oneida, Onondaga and Schoharie Counties.

In Hamilton County, that portion south of Route 28 up to and including the towns of Inlet and Raquette Lake but not including the towns of Sabale, Indian Lake and Blue Mountain Lake.

In Lewis County, the towns of Osceola and West Leyden.

### BRANDS

Molson Canadian

Molson Canadian Light

Molson Exel

Molson Export Ale

Molson Golden

Molson Ice

Molson XXX

Old Vienna

Unless specifically included, the Market Area set forth above excludes Ship Chandler/Duty Free distribution.

12-11-2007 13:55 FAX 3154630666   SPIRIT & SANZONE   Ø029

 

## EXHIBIT A

## PRODUCT PORTFOLIO and MARKET AREA

East Syracuse, NY

According to our records, the following constitutes Distributor's authorized Products and Market Area.

### MARKET AREA

In the State of New York:

All of Cortland, Fulton, Herkimer, Madison, Montgomery, Oneida, Onondaga and Schoharie Counties.

In Hamilton County, that portion south of Route 28 up to and including the towns of Inlet and Raquette Lake but not including the towns of Sabale, Indian Lake and Blue Mountain Lake.

In Lewis County, the towns of Osceola and West Leyden.

### BRANDS

Molson Canadian

Molson Canadian Light

Molson Exel

Molson Export Ale

Molson Golden

Molson Ice

Molson XXX

Old Vienna

Unless specifically included, the Market Area set forth above excludes Ship Chandler/Duty Free distribution.

Reviewed and Accepted this ___17___ day of ___Feb_____, 2004.

**Spirit & Sanzone Distributors Co., Inc.**

By: _____

Francis S. Sanzone, President

330140

11-Feb-04

# EXHIBIT F

 

November 27, 2007

Francis Sanzone
Spirit & Sanzone Distributors Co., Inc.
P.O. Box 696
East Syracuse, NY 13057

**RE:   Molson USA, LLC**

Dear Francis Sanzone:

In connection with the dissolution of the Molson USA, LLC and the transfer of certain of its assets to Coors Brewing Company, please be advised that **effective December 2, 2007,** all existing distribution agreements of Molson distributors with Molson USA, LLC will be assigned to Coors Brewing Company. Coors Brewing Company will assume those distribution agreements in their entirety, and accordingly, as of the effective date of this assignment and assumption, there will be no change to your company's existing distribution agreement for Molson products.

If you require any additional information, please feel free to contact Bill Beyer, Associate General Counsel, at 303-277-7001.

Sincerely,

**MOLSON USA, LLC**                           **COORS BREWING COMPANY**

Linda S. Gawne                                 Edward J. McBrien
President                                      Chief Revenue Office

**EXHIBIT G**

American Arbitration Association
*Dispute Resolution Services Worldwide*

## COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

| | |
|---|---|
| *MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐ There is no additional administrative fee for this service. | |

| | |
|---|---|
| Name of Respondent<br>Spirit & Sanzone Distributors Co., Inc. | Name of Representative (if known) |
| Address<br>6496 Fly Road | Name of Firm (if applicable) |
| | Representative's Address |

| City<br>East Syracuse | State<br>NY | Zip Code<br>13057- | City | State | Zip Code |
|---|---|---|---|---|---|
| Phone No.<br>315-463-6103 | | Fax No.<br>315-463-0868 | Phone No. | | Fax No. |
| Email Address: | | | Email Address: | | |

The named claimant, a party to an arbitration agreement dated January 2, 2001_____, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE

See Exhibit A attached

| | |
|---|---|
| Dollar Amount of Claim $0.00 | Other Relief Sought: ☐ Attorneys Fees ☐ Interest<br>☒ Arbitration Costs ☐ Punitive/ Exemplary ☒ Other See Exh. A |

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $3,250.00

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
An attorney or former judge with at least 10 years experience in commercial litigation

| | |
|---|---|
| Hearing locale New York, NY_____ (check one) ☐ Requested by Claimant ☒ Locale provision included in the contract | |

| | |
|---|---|
| Estimated time needed for hearings overall:<br>_____ hours or 4_____ days | Type of Business: Claimant___Brewer<br>Respondent Distributor |

Is this a dispute between a business and a consumer? ☐Yes ☒No Does this dispute arise out of an employment relationship? ☐ Yes ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one) ☐ Atlanta, GA ☐ Dallas, TX ☒ East Providence, RI ☐ Fresno, CA ☐ International Centre, NY, with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative) Date:<br>1211/07 | Name of Representative<br>Jon P. Christiansen |
|---|---|
| Name of Claimant<br>Coors Brewing Company | Name of Firm (if applicable)<br>Foley & Lardner LLP |
| Address (to be used in connection with this case)<br>c/o William H. Beyer, P.O. Box 4030, NH335 | Representative's Address<br>777 E. Wisconsin Ave. |

| City<br>Golden | State<br>CO | Zip Code<br>80401- | City<br>Milwaukee | State<br>WI | Zip Code<br>53202- |
|---|---|---|---|---|---|
| Phone No.<br>303-277-7001 | | Fax No. | Phone No.<br>414-297-5557 | | Fax No.<br>414-297-4900 |
| Email Address:<br>bill.beyer@coors.com | | | Email Address:<br>jchristiansen@foley.com | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA. Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online. AAA Customer Service can be reached at 800-778-7879

EXHIBIT A TO ARBITRATION DEMAND

*In the Matter of the Arbitration Between*

---

Coors Brewing Company, Claimant

v.

Spirit & Sanzone Distributors Co, Inc., Respondent

---

1.    Coors Brewing Company ("Coors"), a Colorado corporation, is a brewer and seller of beer products.

2.    Spirit & Sanzone Distributors Co., Inc. ("Sanzone"), a New York corporation, is a distributor of various beverages, including Molson beers.

3.    Molson USA LLC ("Molson USA") is a Delaware limited liability company formed in 2000 by Coors and a subsidiary of Molson Canada to take over the United States distribution of Molson products from a joint venture between Molson Canada and Miller Brewing Company.

4.    Molson USA and Sanzone entered into a distributor agreement for the purchase and sale of Molson products in certain counties of New York (the "Distributor Agreement"). The agreement was effective as of January 2, 2001. The Distributor Agreement contains a provision requiring that all disputes between the parties be submitted to arbitration. A copy of the Distributor Agreement is attached hereto as Exhibit A. The Distributor Agreement is terminable without cause upon certain notice.

5.    On December 2, 2007, the Distributor Agreement was assigned by Molson USA to Coors in connection with a transaction by which most of the assets of Molson USA were transferred to Coors.

6.    In 2001, Molson USA adopted a plan of national consolidation (the "Consolidation Plan") that was and is reasonable essential and non-discriminatory. The purpose of the plan was and is to have Molson products distributed by Coors distributors and to have fewer and more financially secure distributors. At the beginning of 2001 there were over 500 Molson distributors in the United States and over 65% of the distributors were not Coors distributors. By the end of 2003, the persuasion of Molson had caused many non-Coors distributors to sell the Molson distribution rights to the local Coors distributor, such that more than 80% of the distributors of Molson products were also Coors distributors.

MILW_2712917.1

7.    On March 11, 2005, Molson USA gave notice to all New York Molson distributors who were not also Coors distributors (the "unaligned distributors") that Molson USA would pursue the Consolidation Plan in New York, though involuntary terminations, if necessary.

8.    In furtherance of the Consolidation Plan, Molson USA commenced a test arbitration case against an unaligned New York distributor, John G. Ryan, Inc ("Ryan"). In the Ryan case, Molson USA asserted that under section 55-c of the New York Alcoholic Beverage Act (the "Act"), Molson USA had good cause to terminate Ryan because of the Consolidation Plan. Molson USA sought a declaration of the amount of compensation due to Ryan because of the termination.

9.    Molson USA gave notice to of the test case to Sanzone and the other unaligned Molson distributors. Molson USA represented to the unaligned distributors that if Molson USA were successful in the test case against Ryan, Molson USA would pursue termination against the other unaligned New York Molson distributors.

10.    Resolution of the Ryan case was delayed because Ryan challenged Molson USA's right to arbitration by commencing an action in New York state court to enjoin the arbitration from proceeding. After removing the case to federal court, Molson USA was successful in obtaining an order compelling Ryan to arbitrate. *See John G. Ryan, Inc. v. Molson USA LLC*, 2005 WL 2977767 (E.D.N.Y. November 7, 2005).

11.    Thereafter, the arbitrator in the Ryan case issued to awards in Molson USA's favor, finding: (1) that Molson USA's Consolidation Plan satisfied the requirements of the Act as a national plan of consolidation; and (2) that the compensation due to Ryan was 2.9 times Ryan's trailing 12 month adjusted gross profit. A copy of each award is attached hereto as Exhibits B and C. Molson USA has commenced a proceeding in the United States District Court for the Southern District of New York to confirm the award.

12.    Molson USA attempted to negotiate with Sanzone for the voluntary sale of the Molson distribution rights, but such effort has been unsuccessful.

13.    As the assignee of Molson USA's rights under the Distributor Agreement, Coors continues to pursue the Consolidation Plan.

14.    The provision of the Act, as amended, that requires Coors to show a contemporaneous reduction in the number of Molson distributors in the states contiguous to New York offends the Dormant Commerce Clause of the United States Constitution, in that the Act impermissibly attempts to regulate the conduct of Molson and Coors beyond the boundaries of the state of New York.

15.    Coors is entitled to an award, as follows:

a.    Declaring that Coors has the right under all applicable law to terminate the Distributor Agreement and any and all other claimed right by which Sanzone distributes Molson products in its assigned New York territory.

2

b.    Declaring the amount of compensation due to Sanzone for the fair market value of the distribution rights and declaring that Sanzone has not suffered any other damages from such termination.

c.    For such other relief as may be proper and just.