UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x

SPIRIT & SANZONE DISTRIBUTORS CO., INC., and                08 CV 0251 (LLS)
SALAMANCA-AREA BEVERAGE COMPANY INC.,

                              Plaintiffs,


          -against-


COORS BREWING COMPANY,

                              Defendant.
--------------------------------------------------------------------x




**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION
FOR A PRELIMINARY INJUNCTION TO STAY THE ARBITRATIONS
COMMENCED BY COORS BREWING COMPANY**




                              Ettelman & Hochheiser, P.C.
                              Attorneys for Plaintiffs
                              100 Quentin Roosevelt Boulevard
                              Suite 401
                              Garden City, New York 11530
                              (516) 227-6300

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................i-vi

SUMMARY OF ARGUMENT ..............................................................1

STATEMENT OF FACTS ......................................................................4

     A.      BACKGROUND……………………………………………4
           Regulation of Beer in New York…………………………….4
           Section 55-c of the ABC Law.........................................................6

     B.      THE RELATIONSHIP BETWEEN PLAINTIFFS
           AND MOLSON/COORS……………………………………...8

ARGUMENT………………………………………………………………11

POINT I
     THE COURT HAS THE AUTHORITY TO
     STAY AN ARBITRATION PROCEEDING………………………….11

POINT II
     RELIANCE ON RYAN V. MOLSON USA WOULD
     BE MISPLACED………………………………………………...12

POINT III
     COORS LACKED GOOD CAUSE TO MATERIALLY
     MODIFY PRIOR AGREEMENTS WHICH DID NOT
     REQUIRE BINDING ARBITRATION ……………………………12

POINT IV
     THE PARTIES DID NOT AGREE TO ARBITRATE
     THEIR DISPUTES……………………………………………….13

     A.      COORS RELIES UPON THE WRONG PROVISION
           WHEN IT ALLEGES THAT THE PARTIES'
           AGREED TO ARBITRATION……………………………..14

     B.      THE PARTIES AGREED THAT NEW YORK'S
           ALCOHOLIC BEVERAGE CONTROL LAW
           SECTION 55-C WOULD BE INCORPORATED
           INTO THE PARTIES' AGREEMENTS…………………………16

F:\Spirit & Sanzone\Molson\arbitration\Application to Stay arbitration\Mol final.doc

C.      THE PARTIES AGREED THAT PROVISIONS
        OF SECTION 55-C WOULD SUPERCEDE ANY
        CONFLICTING PROVISIONS ........................................................17

D.      PLAINTIFFS HAVE NOT WAIVED THEIR
        RIGHT TO APPEAR IN A COURTROOM ...................................19

POINT V
        THE PRE-DISPUTE ARBITRATION PROVISION
        IS UNENFORCEABLE AS AGAINST PUBLIC
        POLICY .........................................................................................20

A.      SECTION 55-C IS NOT PREEMPTED BY
        THE FEDERAL ARBITRATION ACT……………………………21
        The Web-Kenyon Act…………………………………………….. 22

B.      SECTION 55-C IS SAVED BY THE TWENTY-
        FIRST AMENDMENT TO CONSTITUTION ...............................25

        1.      The Twenty-First Amendment ……………………………..26

        2.      New York's Interest Outweighs the
                Federal Interest…………………………………………...29

POINT VI
        THE CONSITUTIONAL ISSUES SHOULD BE
        DECIDED BY A COURT OF LAW.............................................31

CONCLUSION.........................................................................................33

# TABLE OF AUTHORITIES

**CASES**

*324 Liquor Corp. v. Duffy,*
    479 U.S. 335 (1984)..................................................................................29

*Actmedia, Inc. v. Stroh,*
    830 F.2d 957 (9th Cir. 1986) .....................................................................5

*Alexander v. Gardner-Denver Co.,*
    415 U.S. 36 (1974)....................................................................................31

*American Broadcasting Cos., Inc. v. American Fed. of Television and Radio*
    *Artists,*
    412 F. Supp. 1077 (S.D.N.Y. 1976).........................................................11

*Bacchus Imports, Ltd. v. Dias,*
    468 U.S. 263 (1984)............................................................................26, 29

*Bainbridge v. Turner,*
    311 F.3d 1104 (11th Cir. 2002) ........................................................... 28-29

*Battipaglia v. New York State Liquor Authority,*
    745 F.2d 166 (2d Cir. 1984)........................................................................5

*Benjamin v. Traffic Executive Ass'n Eastern Railroad,*
    869 F.2d 107 (2d Cir. 1989)......................................................................31

*Beskind v. Easley,*
    325 F.3d 506 (4th Cir. 2003) ....................................................................29

*Black v. Magnolia Liquor Co.,*
    355 U.S. 24 (1957)......................................................................................5

*Bridenbaugh v. Freeman-Wilson,*
    227 F.3d 848 (7th Cir. 2000), *cert. denied*, 532 U.S. 1002 (2001).........27

*Broder v. Cablevision Systems Corp.,*
    329 F. Supp. 2d 551 (S.D.N.Y. 2004).................................................. 15-16

*California Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc.,*
    445 U.S. 97 (1980)..............................................................................26-28

*Cap Gemini Ernst & Young, U.S., LLC v. Nackel,*
    346 F.3d 360 (2d Cir. 2003*)*......................................................................13

*Capital Cities Cable, Inc. v. Crisp,*
 467 U.S. 691 (1984) ................................................................ 26, 28-29

*Coppinger. v. Metro North Commuter R.R.,*
 861 F.2d 33 (2d Cir. 1988) ................................................................31

*Dickerson v. Bailey,*
 336 F.3d 388 (5th Cir. 2003) ................................................................29

*Doctor's Assocs., Inc. v. Casarotto,*
 517 U.S. 681 (1996) ................................................................13-14

*Flagg v. Yonkers Savings and Loan Assoc.,*
 396 F.3d 178 (2d Cir. 2005) ................................................................15

*Gonzalez v. Shanker,*
 399 F. Supp.858 (S.D.N.Y. 1975) ................................................................31

*Granholm v. Heald,*
 125 S. Ct. 1885 (2005) ................................................................ 22, 26-27

*Gugliotta v. Evans & Co.,*
 690 F. Supp. 144 (E.D.N.Y. 1988) ................................................................21

*Hostetter v. Idlewild Bon Voyage Liquor Corp.,*
 377 U.S. 324 (1964) ................................................................28

*In re Blackburne,*
 87 N.Y.2d 660 (1996) ................................................................21

*In re G. Heileman Brewing Co.,*
 128 B.R. 876 (S.D.N.Y. 1991) ................................................................ 29-30

*James Clark Distilling Co., v. Western Maryland Railway Co.,*
 242 U.S. 311 (1917) ................................................................22

*John G. Ryan, Inc. v. Molson USA, LLC,*
 2005 WL 2977767 (E.D.N.Y. 2005) ................................................12, 18, 19, 24

*Kendall-Jackson Winery, Ltd. v. Branson,*
 82 F.Supp.2d 844 (N.D. Ill. 2000) ................................................................28

*L.F. Rothschild & Co., Inc. v. Katz,*
 702 F. Supp. 464 (S.D.N.Y. 1988) ................................................................11

*Maross Constr., Inc. v. Central New York Regional Transportation Auth.,*
 66 N.Y.2d 341 (1985) ................................................................20

F:\Spirit & Sanzone\Molson\arbitration\Application to Stay arbitration\Mol final.doc

*Matter of Schwartz,*
  425 N.Y.S.2d 41 (2d Dept. 1980) ........................................................20

*Milton S. Kronheim & Co. v. District of Columbia,*
  91 F.3d 193 (D.C. Cir. 1996) .......................................................... 27-28

*Mount Ararat Cemetery v. Cemetery Workers and Greens Attendants Union,*
  975 F.Supp. 445 (E.D.N.Y. 1997) ....................................................11

*North Dakota v. United States,*
  495 U.S. 423 (1990) ........................................................................ 27-29

*Opals on Ice Lingerie v. Body Lines Inc.,*
  320 F.3d 362 (2d Cir. 2003) ..............................................................13

*Satcom Int'l Group PLC v. Orbcomm Int'l Partners L.P.,*
  49 F. Supp. 2d 331 (S.D.N.Y. 1999) .................................................11

*Seiden Assoc., Inc.  v. ANC Holdings, Inc.,*
  959 F.2d 425 (2d Cir. 1992) ...............................................................15

*Shearson/American Express, Inc. v. McMahon,*
  482 U.S. 220 (1987) ...........................................................................21

*Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. and Sys. Co.,*
  643 F.2d 863 (1ˢᵗ Cir. 1981) ..............................................................11

*Stephens v. American International Ins. Co.,*
  66 F.3d 41 (2d Cir. 1995) ............................................................. 24-26

*Swedenburg v. Kelly,*
  358 F.3d 223 (2d Cir. 2004) *rev'd* 125 S.Ct. 1885 (2005)) ............................27, 29

*Toffler v. Pokorny,*
  598 N.Y.S.2d 445 (Sup. Ct. Nassau Co. 1993)............................... 20-21

*Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior*
  *University,*
  489 U.S. 468 (1989)....................................................................... 21-22

**S**TATUTES

Federal Arbitration Act
(9 U.S.C. § 1 *et seq.*)........................................................................11

McCarran-Ferguson Act
(15 U.S.C. § 1011 *et seq.*)................................................................25

Webb-Kenyon Act

(27 U.S.C. §122) ................................................................................................... 22-23

Twenty-first Amendment Enforcement Act
(27 U.S.C. § 122a) ...................................................................................................23

New York Alcoholic Beverage Control Law §55-c ........................................... Passim

Wilson Act, ch.728, 26 Stat. 313 (1890)....................................................................23

Fed. R. Civ. P. 5.1(a) .................................................................................................12

Fed. R. Civ. P. 41(a) and §4.........................................................................................1

## OTHER AUTHORITIES

H.R. Rep. 106-265 .....................................................................................................23

Twenty-first Amendment of the United States Constitution ................................ Passim

Plaintiffs Spirit & Sanzone Distributors Co., Inc. ("Sanzone") and Salamanca-Area Beverage Company, Inc. ("Salamanca") (collectively "Plaintiffs"), respectfully submit their Memorandum of Law in support of Plaintiffs' Motion seeking to permanently stay the Arbitration Proceedings commenced by Defendant Coors Brewing Company ("Coors") against Sanzone, bearing AAA case number 13 155 02713 07 and against Salamanca, bearing AAA case number 13 155 02714 07, (collectively the "Arbitrations").

## SUMMARY OF ARGUMENT

This action is brought pursuant to Fed. R. Civ. P. 41(a) and §4 of the Federal Arbitration Act seeking to enjoin the Arbitration Proceedings currently pending against Plaintiffs because (1) the parties have not agreed to arbitrate; and even if they have, (2) the constitutional nature of the dispute and (3) the fact that arbitration provision violates the express public policy of New York renders the arbitration clause unenforceable.

Sanzone and Salamanca are the exclusive distributors of Molson brand beer ("Molson beer") in various New York counties. Both companies acquired their distribution rights through separate agreements with Martlet Importing Company ("Martlet"), a former U.S. importer of Molson beer (the "Martlet Agreements"). The Martlet Agreements did not contain any provisions requiring arbitration of disputes. Subsequently, Martlet's importing rights were assigned to a joint venture between Miller Brewing Company and Molson Canada, and then in 2000, the importing rights were assigned to Molson USA LLC ("Molson USA"), a joint venture between Coors and Molson Canada. In 2001, at the request of Molson USA, both Sanzone and Salamanca signed the Amendment to Distributor Agreement ("Molson Amendment").

1

According to Coors, on December 2, 2007, Coors acquired by assignment the import rights of Molson USA. By correspondence dated November 27, 2007, Coors notified its Molson distributors, including Sanzone and Salamanca of the assignment and that Coors would be assuming Molson USA's rights and obligations under Molson USA's agreements with its wholesalers.  Subsequently, Coors commenced arbitration proceedings against Sanzone and Salamanca seeking to terminate the parties' distributor agreements and Sanzone's and Salamanca's right to distribute Molson beer. Curiously, Coors alleges that it has the right under New York law to terminate Sanzone and Salamanca pursuant to a plan of consolidation originated by its predecessor Molson USA. Coors also asserts that various provisions of §55-c New York's Alcoholic Beverage Control Law §55-c ("§55-c") are unconstitutional.

While The Molson Amendment contains a provision requiring the parties to resolve their disputes through binding arbitration; the Molson Amendment did not alter the provision contained in the parties' underlying distribution agreements that provided that the law of the jurisdiction where the Molson products were to be sold would be incorporated into the parties' agreement and any conflict between the agreement and such local laws would be resolved in favor of the local law.  With respect to Sanzone and Salamanca, this means that the law of New York is incorporated into the Molson Amendment, and specifically  §55-c, which requires that all beer sold in New York be pursuant to a written agreement that conforms to the provisions of §55-c.  As a result, any provision in the Molson Amendment that conflicts with §55-c is by the terms of the Molson Amendment superseded by the provisions of §55-c.

Succinctly stated, this Court must enjoin Coors' Demand for Arbitration pursuant to §4 of the Federal Arbitration Act because the effect of incorporating §55-c into the

parties' agreements is that there is no binding agreement to arbitrate.  The following sections of §55-c are dispositive.  First, §55-c(3) provides that all beer sold by a brewer to a wholesaler in New York shall be pursuant to an agreement "which conforms to the provisions of this section."  Second, §55-c(6) provides that in the event of a breach of the statute by a brewer, a wholesaler "may maintain a civil action in a court of competent jurisdiction within this state."  Third, §55-c(7)(c) provides that "[n]o brewer or beer wholesaler may impose binding arbitration of any issue as a term or condition of an agreement."  Fourth, §55-c(4)(b) provides that no agreement may be amended or materially modified without "good cause."  Finally, §55-c (11) provides that the rights granted to wholesalers under the statute may not be altered, waived or modified by written or oral agreement in advance of a bona fide case and controversy arising out of a written agreement complying with this section."

Accordingly, Coors' reliance on the arbitration provision contained in §6.2, of the Molson Amendment is ineffectual because the provision is non-operational.  Clearly, the provisions of §55-c(7)(c), which prohibits mandatory pre-dispute arbitration clauses; §55-c(6), which gives wholesalers the right to commence an action in the event of a breach by a brewer; and §55-c(11), which prohibits waivers of the rights contained in the statute, all directly conflict with §6.2 of Molson Amendment  Thus, by the very terms of the Molson Amendment, the arbitration provision is superseded and unenforceable.

Furthermore, as previously stated, the initial agreements between Plaintiffs and Martlet did not contain an arbitration agreement.  It was only when Molson USA took over the import rights and amended the existing agreements by providing Plaintiffs with the Molson Amendment that the arbitration agreement purportedly arose.  However, insofar as §55-c(4)(b) prohibits the amendment or material modification of an agreement

3

without statutory "good cause" the amendment of the Martlet Agreement by the Molson Amendment is not enforceable.  Hence, the arbitration provisions contained in the Molson Amendment are similarly unenforceable.

Finally, even if the Court determines that §6.2 of the Molson Amendment is operational, this Court must still grant Plaintiffs' request to stay arbitration because the pre-dispute arbitration provision contained in §6.2 violates the express public policy of New York.  As will be discussed in more detail below, in this circumstance, the Federal Arbitration Act does not preempt New York's explicit policy against pre-dispute arbitration clauses in the field of alcohol policy.  In addition, Coors Demand for Arbitration must also be stayed because Coors' attempt to declare various provisions of New York law unconstitutional is more appropriately suited for ruling by a judge and not an arbitrator.

## **STATEMENT OF FACTS**

A.    BACKGROUND

### *Regulation of Beer in New York*

Drawn by six big brewery horses, a shiny red Busch stake wagon clattered up to the entrance of the Empire State Building.  Out of the Door stepped Alfred Emanuel Smith in velvet-collared overcoat.  Regarded by his whopping admirers as a martyr to national Prohibition reform in 1928, he received his case of Budweiser with a grin.  "This is surely a happy day for us all," said the Happy Warrior.  "My only regret is that the wagonload is not all mine."  Prosit!, Time, 17 April 1933.

Due to the unique history of Prohibition and its eventual and predictable repeal, the 21st Amendment to the Constitution grants States considerable power to regulate the sale and distribution of alcohol within its borders.  Specifically, §2 of the Amendment reserves to the States the power to regulate and prohibit "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or

4

use therein of intoxicating liquors" within their borders.  In *Battipaglia v. New York State*

*Liquor Authority*, 745 F.2d 166 (2d Cir. 1984), Judge Friendly astutely commented,

> The Twenty-First Amendment was designed to end the
> "noble experiment" by which the Federal government
> endeavored to control the drinking habits of all citizens and
> to place control of alcoholic beverages in the states.
> Fulfillment of the latter purpose required that, in addition to
> repealing the Eighteenth Amendment, which was
> accomplished by § 1, the Amendment should give the states
> full authority to deal with the subject of intoxicating liquor
> free from limitations imposed by the Commerce Clause,
> which had hampered such regulation before the Eighteenth
> Amendment was adopted.

*Battipaglia,* 745 F.2d at 168-69.

In so granting states "full authority to deal with the subject of intoxicating liquor,"

in 1934 New York passed the Alcohol Beverage Control Law, which boldly asserted that:

> It is the declared policy of the [New York] state that it is
> necessary to regulate and control the manufacture, sale, and
> distribution within the state of alcoholic beverages for the
> purpose of fostering and promoting temperance in their
> consumption and respect for and obedience to the law. §2
> of ABC Law.

The intent of New York's ABC Law was to correct, in part, past abuses associated with

the sale and marketing of alcohol which were believed to have caused Prohibition,

namely the existence of "tied houses" in which brewers and distillers were able achieve

complete vertical integration over the channels of distribution.  *See generally Actmedia,*

*Inc. v. Stroh*, 830 F.2d 957, 959 (9th Cir. 1986).  As the Supreme Court noted in  *Black v.*

*Magnolia Liquor Co.*, 355 U.S. 24 (1957), tying agreements "serve no purpose beyond

the suppression of competition."

Thus, in an attempt to stave off vertical integration and to ensure competition in

the marketplace, New York statutorily mandated a three-tier network for the distribution

5

of malt-based alcoholic beverages ("Beer").  The three tiered system has four primary

goals, namely (1) to avoid the overly aggressive marketing and sales practices that were

prevalent in the pre-Prohibition era; (2) to generate tax revenue that can be easily and

efficiently collected, particularly from domestically located distributors; (3) to facilitate

state and local control of alcoholic beverages by requiring each tier to be licensed, and (4)

to encourage moderate consumption.  At the top of the three-tiered system is the supplier

or brewer of Beer, such as Coors and Molson.  Distributors or wholesalers such as

Sanzone and Salamanca occupy the middle tier; they purchase, resell, market, and

promote Beer.  Retailers occupy the bottom tier and sell to the general public.  *See*

*generally*, ABC Law.

Brewers selling Beer in New York do so by granting distributors exclusive

territories.  When a brewer grants the right to distribute its products in a given territory,

no other distributor may distribute those same products in the territory.  As a result,

wholesalers within a territory tend to become associated with the brands they distribute,

*e.g.*, the "Molson wholesaler," or the "Coors wholesaler."  Further, distributors such as

Sanzone and Salamanca do much more than simply re-sell a brewers' product to retailers.

They compete with distributors of other brands for market share by actively marketing

the brand.  They also insure freshness, ensure sufficient supply, collect empty containers,

participate in promotions, and generally create and ensure the continuation of good-will

in a given brewers' products.

### Section 55-c of the ABC Law

In recognition of the substantial role distributors play in the development of the

market and good will of a brewers' products, and the equity that wholesalers develop in

such products, as well as to protect the significant investment of capital and resources

6

distributors invest, in 1996 New York enacted §55-c of the ABC Law.  Section 55-c was enacted as a remedial statute to level the playing field between brewers and wholesalers by providing procedural and substantive safeguards not available at common law.  The primary remedial provisions of §55-c relate to (a) requiring all distribution agreements to conform to the provisions of the statute and be in writing, and (b) the prohibitions against terminating, amending and/or materially modifying the terms of the agreement without good cause.  The definition of "good cause" is exceedingly narrow, limited essentially to (i) the implementation of a national or regional policy of consolidation which is "reasonable, non-discriminating, and essential," and (ii) the failure to comply with a material term of the distribution agreement after notice and an opportunity to cure.  §55-c(2)(e).  Further, a policy of consolidation must extend beyond New York and must be "reasonable, nondiscriminatory and essential."[1]  §55-c(2)(e)(i)(A)

In essence, once a brewer commences a relationship with a distributor, that relationship can not be terminated unless the distributor fails to perform its obligations or the brewer can establish compliance with the strict requirements of a national or regional policy of consolidation.  Thus, §55-c protects the economic interests of distributors from the whims of the brewers, while protecting the brewer from wholesalers who fail to perform their obligations under an agreement that complies with the statute.

In order to assure compliance with the statute, the legislature mandated that no brewer can require a wholesaler to agree to submit a dispute over any issue to binding arbitration, §55-c(7), and that an aggrieved wholesaler has the right to bring a civil action

---

[1] Thus, the legislature has created an objective standard to determine whether a brewer's attempt to consolidate is sufficient.  In other words, the policy of consolidation must be examined in the context in which it is being implemented.

in court to challenge a termination.  §55-c(6).  Finally, in order to protect wholesalers

from overreaching brewers, the statute states that its requirements "may not be altered,

waived or modified in advance of a bona fide case and controversy  . . ." §55-c(11).

Thus, the statute does not necessarily entirely ban agreements to arbitrate, but does

prevent pre-dispute arbitration clauses such as the one at issue.  This protection ensures

that agreements to arbitrate are freely entered into only as a means of resolving disputes

after they arise rather than being foisted on wholesales by their brewers.

B.    UNDERLINE THE RELATIONSHIP BETWEEN PLAINTIFFS AND MOLSON/COORS

Sanzone has been a Molson distributor for over twenty years, having been granted

the exclusive right to distribute Molson beer in the State of New York, the counties of

Herkermer, Oneida, Montgomery, Fulton, Schoharie and a portion of Hamilton County in

1986 pursuant to a letter of appointment with Martlet Importing Co., Inc., a former U.S.

importer of Molson products ("Martlet").  Thereafter, Sanzone acquired the exclusive

right to distribute Molson beer in the counties of Cortland, Madison, Onondaga and a

portion of Lewis County.  Sanzone signed a written distribution agreement with Martlet

for the distribution of Molson beer, in its exclusive territory.

The relationship between Salamanca and Molson began in 1990 when Salamanca

was granted the exclusive right to distribute Molson beer in a portion of Cattaraugus

County.  Thereafter, in 1997, Salamanca was granted the exclusive right to distribute

Molson beer in the county of Chautauqua. Salamanca was granted its right to distribute

Molson beer through a simple letter of appointment.  Salamanca was not required to sign

a written distribution agreement relating Molson beer when it obtained the distribution

rights to the brand.  Rather, the agreement between Salamanca and Martlet developed and

was defined by the parties' course of dealing.

In the late 1990s, Martlet's importing rights to Molson beer were assigned to a joint venture between Miller Brewing Company and Molson Canada. Thus, at the time, the Miller-Molson joint venture became the supplier of Molson beer to Plaintiffs for their respective exclusive territories. Both Sanzone's and Salamanca's primary domestic brand is, and was at the time of the Miller-Molson joint venture, Miller. Miller did not require either of the Plaintiffs to sign a written distribution agreement with respect to Molson beer when Miller was responsible for importing Molson beer pursuant to the Miller-Molson joint venture.

Molson's relationship with Miller ended in 2000. Thereafter, in December 2000 a joint venture was formed between Molson Inc. and the Coors Brewing Company (Molson 2000 LLC) for the sole purpose of distributing Molson beer in the United States. In or about January 2001, Coors assumed sales and distribution responsibilities of the new joint venture between Molson and Coors. At that time, Molson 2000 LLC, which later changed its name to later changed to Molson USA, requested Plaintiffs and its other New York Molson distributors execute the Molson Amendment.

On January 2, 2001, Salamanca executed the Molson Amendment. Section 1.2 of the Molson Amendment provided that the relationship between Molson and Salamanca would be governed by the Prior Molson Agreement, as amended, annexed to the Molson Amendment as Exhibit A.

On January 29, 2001, Sanzone executed the Molson Amendment. Section 1.1 of the Molson Amendment provided that Sanzone assigned the prior Martlet Agreement[2] to

---

[2] As set forth in the Declaration of William Sanzone, Sanzone has been unable to locate a copy of the signed Martlet Distributor Agreement. Notwithstanding, by letter dated October 28, 2002, annexed hereto as Exhibit C to the Sanzone Declaration, Molson has [Footnote continued on next page.]

9

Molson USA LLC.  The Molson Amendment further provided that the relationship

between Molson and Sanzone would be governed by the terms of the Prior Martlet

Agreement, as amended by the Molson Amendment.

Notably, neither of the Plaintiffs was involved in a case or controversy with

Molson USA at the time the Molson Amendment was signed.  Further, there was no

"good cause" for the amendment of the parties' existing agreement with Martlet at the

time the Molson Amendment was signed.

By letter dated November 27, 2007, Defendant, Coors announced to Plaintiffs

that, in connection with the dissolution of Molson USA, the Plaintiffs' distribution

agreements with Molson USA were assigned to Coors.

On December 11, 2007, Coors commenced the instant Arbitrations against

Plaintiffs before the American Arbitration Association.  These Arbitrations are

purportedly based on the pre-dispute arbitration clause contained in the Molson

Amendment.  Pursuant to these Arbitrations, Coors is seeking an award declaring that

Coors, as a result of the consolidation plan of its predecessor Molson USA, has the right

under §55-c to terminate the distributor agreements by which Plaintiffs distribute Molson

beer in their assigned territories.  To support its position, Coors asserts, that §55-c is

unconstitutional as it allegedly violates the Dormant Commerce Clause by regulating the

conduct of Molson and Coors beyond the boundaries of the State of New York.

---

confirmed the fact that Sanzone's distributor agreement was the Martlet Distributor
Agreement.  Respectfully, even if it is found that the Martlet Distributor Agreement is not
the operative agreement, the relationship between Molson and Sanzone (like Salamanca)
would be governed by the Prior Molson Agreement, as set forth in the Molson
Amendment.

By this motion, Plaintiffs seek an order from this Court permanently staying the Arbitrations.

## ARGUMENT

## POINT I

## THE COURT HAS THE AUTHORITY
## TO STAY AN ARBITRATION PROCEEDING

This Court has the authority to stay the Arbitrations commenced by Coors.  The Federal Arbitration Act ("FAA") is applicable to the parties' agreement as it is undisputed that the nature of this dispute involves interstate commerce. 9 U.S.C. §1 *et seq.*  It is well settled in this district that §4 of the FAA can be applied to stay or enjoin an arbitration proceeding when the parties have not agreed to arbitration.  While the courts note that this section does not expressly grant a the federal courts the power to stay an arbitration proceeding, the courts of this district, relying upon the decision of the First Circuit in *Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. and Sys. Co.,* 643 F.2d 863, 868 (1st Cir. 1981) have held that such a power exists pursuant to §4 of the FAA as the "concomitant power" to compelling a party to arbitrate.  *See Satcom Int'l Group PLC v. Orbcomm Int'l Partners L.P.,* 49 F. Supp. 2d 331, 342 (S.D.N.Y. 1999); *L.F. Rothschild & Co., Inc. v. Katz,* 702 F. Supp. 464 (S.D.N.Y. 1988*); American Broadcasting Cos., Inc. v. American Fed. of Television and Radio Artists,* 412 F. Supp. 1077, 1082 (S.D.N.Y. 1976).

To that end, the courts have also held that when determining whether to issue as stay of the arbitration, the court will presume irreparable harm if a party is forced to arbitrate a dispute that is not subject to a valid arbitration agreement. *See Mount Ararat Cemetery v. Cemetery Workers and Greens Attendants Union*, 975 F. Supp. 445, 447

(E.D.N.Y. 1997) (irreparable harm is presumed if a party is forced to arbitrate a dispute not subject to a valid arbitration agreement). Accordingly, as demonstrated below, because the Plaintiffs' distribution agreements do not contain an arbitration provision, the issuance of a stay of the Arbitrations is warranted.

## POINT II

### RELIANCE ON RYAN V. MOLSON USA WOULD BE MISPLACED

Coors will no doubt attempt to rely on *John G. Ryan, Inc.  v. Molson*, *USA, LLC* No. 05CV3984, 2005 WL 2977767 (E.D.N.Y. November 7, 2005), for its holding that an injunction is not warranted in this case. However, *Ryan* is factually and legally distinguishable from this case in many ways. First, *Ryan* did not address the legal issue of whether §55-c was incorporated into the parties' agreement. Second, *Ryan* did not address the legal issue of whether the Molson Amendment was void because good cause did not exist to amend the parties' prior agreements. Third, Molson USA did not allege during arbitration that it was seeking a declaration that §55-c is unconstitutional pursuant to the Dormant Commerce Clause as Coors. Thus, in *Ryan*, the New York Attorney General did not have a right to intervene in the case pursuant to Fed. R. Civ. P. 5.1(a) as he does here. Lastly, to the extent that certain aspects of *Ryan* are not distinguishable, it is Plaintiffs' position that the holding in *Ryan* was wrong and, in any event, does not bind this Court.

## POINT III

### COORS LACKED GOOD CAUSE TO MATERIALLY MODIFY PRIOR AGREEMENTS WHICH DID NOT REQUIRE BINDING ARBITRATION

In order to protect the integrity of this three-tiered system, New York enacted §55-c, which was intended to correct gross imbalances in the bargaining positions of

12

brewer and wholesaler and to level the playing field.  Specifically, §55-c(3) requires that

that the relationship between a brewer and wholesaler be governed by a written

agreement and that the terms of that agreement may not be terminated, cancelled, or

materially modified except for good cause.  Further, §55-c(4)(b) provides that an

agreement may not be amended without good cause.  Thus, New York law forbids a

brewer from significantly altering the relationship with its brewers but for "good cause."

The statute places the burden on the brewer to demonstrate good cause.

In its Demand for Arbitration, Coors asserts that its sole right to compel binding

arbitration is contained in the Molson Amendment.  However, the Molson Amendment is

exactly the type of material modification or amendment that §55-c(3) and (4) forbids.

Obviously, the Molson Amendment constituted an amendment of the prior agreements or

material modification of the parties' prior relationship.  Since, Coors' (which has the

burden of proof) cannot demonstrate that good cause existed at the time both Sanzone

and Salamanca signed the Molson Amendment, the Molson Amendment, including its

arbitration provision, is void.

## <u>POINT IV</u>

### THE PARTIES DID NOT AGREE TO ARBITATE THEIR DISPUTES

Where the parties have not agreed to arbitration, courts will not compel a party to

arbitrate or force a party to arbitrate against its will.  Thus, though the presumption in

favor of arbitration may be strong, the law requires that there be an enforceable

arbitration agreement before compelling the parties to arbitrate the dispute. *See Opals on*

*Ice Lingerie v. Body Lines Inc.,* 320 F.3d 362 (2d Cir. 2003).

When evaluating whether the parties have entered into a valid arbitration

agreement, a court must look to state law principles. *See Cap Gemini Ernst & Young,*

*U.S., LLC v. Nackel,* 346 F.3d 360, 364 (2d Cir. 2003*), citing Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681 (1996) ("noting that '[g]enerally applicable contract defenses . . . may be applied to invalidate arbitration agreements without contravening §2 [of the FAA]"); 9 U.S.C. §2 (agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract").

A review of the Prior Martlet Agreement and the Prior Molson Agreement reveals that the parties' agreed that their disputes would be resolved through litigation in a court of competent jurisdiction in the State of New York.  Both the Prior Martlet Agreement and the Prior Molson Agreement specifically incorporate the law of New York and thus §55-c into the distribution agreement and both provide that in the event of a conflict between New York law and the terms of the agreement, that New York law prevails.  As demonstrated below, §55-c not only provides beer wholesalers with access to the court system, but it renders pre-dispute arbitration clauses unenforceable. Thus, §6.2 of the Molson Amendment which provides for arbitration, conflicts with §55-c because the terms of the parties' distribution agreement provide that the wholesaler has the right to have its dispute decided by the courts and any pre-dispute arbitration clause is unenforceable, the parties did not agree that arbitration was the forum to resolve their disputes.

A.    COORS RELIES UPON THE WRONG PROVISION WHEN IT
       ALLEGES THAT THE PARTIES' AGREED TO ARBITRATION

In its Demand for Arbitration, Coors erroneously alleges that it commenced the Arbitration pursuant to a valid agreement to arbitrate, in particular, relying on §6 of the Molson Amendment.  Section 6 of the Molson Amendment deleted paragraph 17(b) of

the Prior Martlet Agreement and paragraph 18(b) of the Prior Molson Agreement (both

provided for the litigation of all disputes before the United States District Court) and

purportedly replaced these paragraphs with the following language:

> Any and all disputes between Distributor and the Company or its agent,
> Coors, except nonpayment of Distributor's account, including without
> limitation a dispute as to whether the Company has grounds to terminate
> this Agreement, which disputes are not resolved by Mediation, shall be
> submitted to binding arbitration in the city nearest to the Distributor in
> which there is a regional office of the American Arbitration Association,
> before a single arbitrator, in accordance with the Commercial Arbitration
> Rules and procedures of the American Arbitration Association.  §6.2 of
> Molson Amendment.

However, Coors reliance upon this provision is misplaced.  Coors completely

ignores paragraph 17(a) of the Prior Martlet Agreement ("Martlet ¶17(a)") and paragraph

18(a) of the Prior Molson Agreement ("Molson ¶18(a)"), which were unaffected by the

Molson Amendment.   Indeed, these paragraphs continue to govern the parties'

relationship.

Martlet ¶17(a) and Molson ¶18(a) provide, in pertinent part:

> The laws, rules and regulations of the jurisdiction in which Distributor
> conducts its business are hereby incorporated in this Agreement to the
> extent that such laws, rules and regulations are required to be so
> incorporated and shall supersede any conflicting provision of this
> Agreement.  § 18(a) of Molson Agreement.

It is well settled that a contract may incorporate particular state laws as contract

terms.  *Flagg v. Yonkers Savings and Loan Assoc.*, 396 F.3d 178, 186 (2d Cir. 2005).

The contract language incorporating such laws must do so with specificity. *Id.*  If the

language contained in the contract is unambiguous, the Court's primary objective is to

give effect to the intent of the parties as revealed by the language they choose to use.

*Broder v. Cablevision Systems Corp.,* 329 F. Supp. 2d 551, 556 (S.D.N.Y. 2004) (quoting

*Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)).

15

"Contractual language is unambiguous if it has 'a definite and precise meaning,' and 'there is no reasonable basis for a difference of opinion as to its interpretation.'" *Broder v. Cablevision Systems Corp.,* 329 F. Supp. 2d 551, 556 (S.D.N.Y. 2004) (citations omitted).

Here, Martlet ¶17(a) and Molson ¶18(a) specifically provide that the laws the jurisdiction in which the Distributor conducts its business, in this case New York, shall be incorporated as a term of the distribution agreement to the extent such laws are required to be incorporated.  It is undeniable that these provisions have a definite and precise meaning and contain clear language of incorporation.   Certainly, this provision not only specifies what laws – "the laws, rules and regulations of the jurisdiction in which the Distributor conducts its business" – but it also explicitly states "are hereby incorporated in this Agreement." Accordingly, because this provision is unambiguous, it was the clear intent of the parties that the laws of the State of New York, in particular New York's Alcoholic Beverage Control laws, be incorporated into the parties' distribution agreement.

B.     THE PARTIES AGREED THAT NEW YORK'S ALCOHOLIC
       BEVERAGE CONTROL LAW SECTION 55-C WOULD BE
       INCORPORATED INTO THE PARTIES' AGREEMENTS

Pursuant to Martlet ¶17(a) and Molson ¶18(a), §55-c of New York's Alcoholic Beverage Control Law became a term of the distribution agreement.  Indeed, it cannot be disputed that §55-c of New York's Alcoholic Beverage Control Law is a law "of the jurisdiction in which Distributor conducts its business" and is "required to be so incorporated" in all beer distribution agreement in the State of New York.   The expressed purpose of §55-c is to carry out the policy of the State that the sale and delivery of beer by brewers to beer wholesalers be pursuant to a written agreement <u>which</u>

conforms to the requirements of the Statute. *See* §55-c(1)(emphasis added).  Moreover, §55-c(3) entitled "Written agreement required" provides that

> Except as provided for in subdivision ten[3] . . . beer offered for sale in this state by a brewer to a beer wholesaler shall be sold and delivered pursuant to a written agreement which conforms to the provisions of this section and which sets forth all of the essential and material terms, requirements, standards of performance and conditions of the business relationship between the brewer and a beer wholesaler." (emphasis added).

Thus, by specifically stating that the agreement between the brewer and beer wholesaler must conform to the provision of §55-c, the legislature has required the Statute to be incorporated in these agreements.   Indeed, this is the same position that Coors is taking when asserting its right to terminate Plaintiffs for "good cause" as defined in §55-c.  Absent the incorporation of §55-c(2)(e)(i) and (4) into the parties' agreement, Coors would have no basis to terminate Plaintiffs as a result of the implementation of a policy of consolidation.  Thus, it would be disingenuous, at best, for Coors to dispute that the provisions of §55-c are terms of the parties' distribution agreement.

C.    THE PARTIES AGREED THAT PROVISIONS OF SECTION 55-C WOULD SUPERSEDE ANY CONFLICTING PROVISIONS

Pursuant to Martlet ¶17(a) and Molson ¶18(a), the parties' not only agreed that the provisions of §55-c would be enforceable terms of their distribution agreement, but they also expressly agreed that these provisions would "supersede any conflicting provision of this Agreement."  Thus, if a provision of §55-c conflicts with a term of the Molson Amendment, the provision of §55-c will supersede and replace the term

---

[3] Subdivision 10, paragraph (a) exempts from the Statutes coverage only those written agreements in effect prior to the effective date of the Statute "which set forth all terms and conditions of material significance governing the relationship between the brewer and beer wholesaler."

17

contained in the Molson Amendment.

Section 55-c contains two provisions (§55-c(7) and(6)) which directly conflict with the arbitration provision contained in the Molson Amendment.  Subsection (7) of §55-c directly conflicts with the arbitration clause as it renders pre-dispute arbitration clauses unenforceable.  Specifically, this subsection provides, in pertinent part "No brewer or beer wholesaler may impose binding arbitration of any issue as a term or condition of an agreement.  Indeed, in *John G. Ryan, Inc. v. Molson USA, LLC,* 2005 WL 2977767 (E.D.N.Y. 2005), the "test case" in which Molson relies upon the identical arbitration clause, the United States District Court for the Eastern District of New York found that §55-c(7) explicitly bans pre-dispute arbitration clauses, such as the one at issue in this case.  Thus, it must be concluded that §55-c(7) directly conflicts with the pre-dispute arbitration clause contained in the Molson Amendment, and therefore §55-c(7) supersedes and replaces the pre-dispute arbitration clause.  Consequently, the pre-dispute arbitration clause, relied upon by Coors, never became a term of the Plaintiffs' distribution agreements.

Similarly, subsection (6) of §55-c also conflicts with the pre-dispute arbitration clause because it requires that disputes between brewers and beer wholesalers be adjudicated in the court system.   Specifically, §55-c(6), entitled Right of Action, provides "[i]f a brewer fails to comply with the provisions of this section, a beer wholesaler may maintain a civil action in a court of competent jurisdiction within this state for damages sustained in accordance with the laws of this state which shall govern all disputes arising under an agreement or by reason of its making and performance." This subsection explicitly grants an aggrieved wholesaler the right to file a civil action to challenge a termination of its distribution agreement. Thus, §55-c(6) also supersedes and

replaces §6 of the Molson Amendment and Plaintiffs have the right to challenge Coor's attempted termination in court.

Accordingly, based upon the express terms of the Plaintiffs' distribution agreements that (i) pre-dispute arbitration clauses are unenforceable; and (ii) the distributor has the right to adjudicate in court the issue of whether the distribution agreement can be terminated, this Court must find that the parties did not enter into an agreement to arbitrate this dispute.

D.    PLAINTIFFS HAVE NOT WAIVED THEIR
      RIGHT TO APPEAR IN A COURTROOM

As additional protection for beer wholesalers, the legislature specifically provided that "the requirements of this section [55-c] may not be altered, waived or modified by written or oral agreement in advance of a bona fide case and controversy arising under a written agreement complying with this section." §55-c(11) of ABC law.   The Molson Amendment which, on the surface, purports to take away Plaintiffs' rights to maintain a civil court action and instead, provides for arbitration, constitutes a waiver of Plaintiffs' prescribed rights under §55-c; an act which the legislature specifically prohibited. *See John G. Ryan, Inc. v. Molson USA, LLC,* 2005 WL 2977767 (E.D.N.Y. 2005). Salamanca did not have a written agreement with Molson at the time the Molson Amendment was signed, other than a mere appointment letter.  Therefore, Salamanca could not waive its statutory rights because there could not have been "a bona fide case or controversy arising under a written agreement complying with this section" because Salamanca did not have a  written agreement complying with §55-c.  Similarly, while Sanzone was a party to the Prior Martlet Agreement, that agreement provided that any disputes be litigated in a court of competent jurisdiction. Thus, imposing a pre-dispute

19

arbitration clause would be an amendment or a material modification of the parties' prior agreement including significant waivers of statutory rights.  Because the Molson Amendment was not executed as a result of a "bona fide case and controversy," Sanzone could not waive those statutory rights under §55-c.  Accordingly, even though Molson required Plaintiffs to sign the Molson Amendment, this Court must find that Plaintiffs could not have waived their statutory right to have this Court determine whether a termination of their distribution agreement is in accordance with §55-c.

## POINT V

### THE PRE-DISPUTE ARBITRATION PROVISION IS UNENFORCEABLE AS AGAINST PUBLIC POLICY

The pre-dispute arbitration clause contained in the Molson Amendment  is unenforceable because it violates the express public policy of the State of New York as embodied in §55-c, which prohibits pre-dispute arbitration clauses such as the one relied on by Coors in its demand for arbitration.

Where a statute precludes arbitration or exclusively bestows jurisdiction over a particular type of dispute on the courts, an agreement to arbitrate will not be given effect. *In re Blackburne*, 87 N.Y.2d 660, 665 (1996) ("If a statute, decisional law or public policy precludes the [parties] from referring the dispute to arbitration … the claim is not arbitrable."); *Maross Constr., Inc. v. Central New York Regional Transportation Auth.*, 66 N.Y.2d 341, 345 (1985) ("where jurisdiction over a particular type of dispute is statutorily bestowed exclusively upon the courts … an agreement to arbitrate will not be given effect by the courts."); *Matter of Schwartz*, 425 N.Y.S.2d 41 (2d Dept. 1980) ("Cases involving public policy considerations which are embodied in statute or decisional law and which prohibit, in an absolute sense, the granting of the relief sought,

should not proceed to arbitration for the resolution of the issues."); *Toffler v. Pokorny*, 598 N.Y.S.2d 445, 447 (Sup. Ct. Nassau Co. 1993) (an agreement to arbitrate will not be enforced where jurisdiction over a particular type of dispute is statutorily bestowed exclusively upon the courts"); *see also Gugliotta v. Evans & Co.*, 690 F. Supp. 144, 146-47 (E.D.N.Y. 1988).

Here, the public policy of New York State is clear and unambiguous. Pursuant to §2 of the 21st Amendment, New York has created a regulatory framework designed to create strong, independent and long-term distributors of beer. Section 55-c is the embodiment of that policy. There can be no dispute that in order to implement this policy the legislature deemed it necessary to assure that wholesalers have access to courts (and the appeal process) and the legislature deemed it necessary to ban pre-dispute arbitration clauses. Indeed, enforcement of a pre-dispute arbitration clause would affect a waiver of the wholesaler's right to seek judicial relief; another evil which the legislature specifically prohibited.

A.    SECTION 55-C IS NOT PREEMPTED BY THE
      FEDERAL ARBITRATION ACT

While the FAA codifies the federal policy of enforcing arbitration agreements, Congress may override this presumption through a contrary provision in another statute. *See Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226, 107 S. Ct. 2332, 2337 (1987). Moreover, "the FAA contains no express preemptive provision nor does it reflect a congressional intent to occupy the entire field of arbitration." *Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior University*, 489 U.S. 468, 469, 109 S. Ct. 1248, 1250 (1989) (holding that the FAA did not preempt a California law permitting a court to stay arbitration pending resolution of related

21

litigation where parties agreed to abide by state rules of arbitration). However, it is the party opposing arbitration that bears the burden to prove that Congress intended a separate statute to preclude a waiver of judicial remedies, such as arbitration.  *See Volt*, 489 U.S. at 469, 109 S. Ct. 1248, *Shearson*, 482 U.S. at 227.

### *The Web-Kenyon Act*

In passing the Webb-Kenyon Act (27 USC §122), as amended, Congress intended to grant States the right to enact laws regarding the distribution of alcohol within their borders, including the resolution of disputes relating to such distribution.  First enacted in 1913, the Webb-Kenyon Act prohibits the "shipment or transportation, in any manner or by any means whatsoever, of any . . . liquor of any kind, from one State . . . into another State which  . . . is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State . . . ."  27 U.S.C. § 122.4.  In 2000, the Web-Kenyon Act was amended by the Twenty-first Amendment Enforcement Act (27 U.S.C. § 122a) (the "Enforcement Act"), which federalized State liquor laws by permitting State Attorney Generals to enforce state law by seeking injunctive relief in federal court. Specifically, the Enforcement Act provides:

> [i]f the attorney general has reasonable cause to believe that
> a person is engaged in, or has engaged in, any act that
> would constitute a violation of State law regulating the
> importation or transportation of any intoxicating liquor, the
> attorney general may bring a civil action in accordance
> with this section for injunctive relief (including a
> preliminary or permanent injunctive) against the person, as
> the attorney general determines to be necessary to (1)
> restrain the person from engaging, or continuing to engage,
> in the violation; and (2) enforce compliance with the State
> law.  27 U.S.C. § 122a (b).

The Enforcement Act was enacted to fill a void as neither the Twenty-first

Amendment nor the Webb-Kenyon Act included any criminal or civil penalties for

violations of its provisions.  *See* H.R. Rep. 106-265.  Thus, prior to the enactment, it was

difficult for States to bring actions against violators in federal court or to obtain

jurisdiction over violators.  *Id.*  Accordingly, this statute was introduced to specifically

provide States with access to federal court to enforce State laws regulating interstate

alcohol distribution.  *Id.*

By virtue of Webb-Kenyon and the Enforcement Act, Congress has subsumed

state liquor laws, including the New York Alcoholic Beverage Control Law.  The effect

is that state liquor laws are now the equivalent of federal law.  Accordingly, this Court

should find that Congress, by enacting the Webb-Kenyon Act, and thereafter the

---

[4] Prior to the enactment of the Webb-Kenyon Act, many states attempted to ban the
production and consumption of alcohol, but were stuck down by the Supreme Court as
violation of the Commerce Clause.  *See Granholm v. Heald*, 125 S. Ct. 1885, 1913-1917
(2005) (Thomas, J., dissenting).  Congress reacted by enacting the Wilson Act, ch.728, 26
Stat. 313 (1890), which purported to give the States the authority to regulate imported
liquor to the same extent as if the liquor had been produced in such State. *Id.*  The
Supreme Court narrowly construed the Wilson Act and precluded States from regulating
the direct shipments to in-state consumers by out-of-state distributors.  *Id.*  Congress
responded by enacting the Webb-Kenyon Act, to ensure that States had the authority to
prevent the importation of alcohol within their borders. *Id.*  The Webb-Kenyon Act was
[Footnote continued on next page.]

F:\Spirit & Sanzone\Molson\arbitration\Application to Stay arbitration\Mol final.doc

Enforcement Act, intended to federalize state liquor laws and thus, disputes regarding the regulation of alcohol are not preempted by the FAA.

Even if the court does not hold that the Enforcement Act assimilates all State liquor laws, Congress did not intend for the FAA to interfere with the States' ability under the 21st Amendment and the Webb-Kenyon Act, to regulate the distribution of alcoholic beverages, including, providing for mandatory access to the courts to determine disputes over the ability of a brewer to terminate a wholesaler.

Under strikingly similar circumstances, the Second Circuit in *Stephens v. American International Ins. Co.*, 66 F.3d 41 (2d Cir. 1995), ruled that the FAA did not preempt a State statute that was enacted pursuant to the authority granted to the States by Congress. *But See Ryan v. Molson*, No. 05CV3984, 2005 WL 2977767 (E.D.N.Y. November 7, 2005). Specifically, in *Stephens*, the issue before the Second Circuit was whether an anti-arbitration provision contained in the Kentucky Insurers Rehabilitation and Liquidation Law, a state statute, is exempt from preemption by the FAA by virtue of the McCarran-Ferguson Act. *Id.* In *Stephens* a Liquidator of an insolvent insurance company commenced a lawsuit in the Southern District of New York against various companies seeking recovery of premiums owed and an order of specific performance to recover future premiums. The defendants moved to compel arbitration under the FAA. The Liquidator opposed the motion arguing that the Kentucky Insurers Rehabilitation Act contains a statutory prohibition against compelling a liquidator to arbitrate. The defendants argued that the FAA preempted the state law. The Liquidator maintained and the Second Circuit agreed, that the FAA does not apply, because the McCarran-Ferguson

upheld in *James Clark Distilling Co., v. Western Maryland Railway Co.*, 242 U.S. 311, [Footnote continued on next page.]

Act (15 U.S.C. § 1011 *et seq.*) preserved the state statute from preemption as Congress granted the states the authority to regulate and tax the business of insurance.

In the present case, the Constitution and the Webb-Kenyon Act (a federal statute) preserve for the States the right to regulate the distribution of alcoholic beverages. Accordingly, this Court should follow the rationale and holding in *Stephens* and find that the FAA does not preempt the State statute as this statute was enacted pursuant to the authority granted to the States by Congress.

Although the Webb-Kenyon Act, as amended, does not specifically set forth the restrictive language contained in the McCarran-Ferguson Act noted by the Court of Appeals in *Stephens* to the effect that only an Act of Congress which *specifically* relates to the business of insurance will be deemed to invalidate any state insurance law, the holding of *Stephens* is equally applicable to the instant case because restrictive language would have been superfluous in the Webb-Kenyon Act. As set forth above, the Webb-Kenyon Act granted the States the authority to regulate the distribution of alcoholic beverages just as the McCarran-Ferguson Act gave the states the authority to regulate insurance. However, because the Webb-Kenyon Act, followed by the 21st Amendment, granted the States the *exclusive right* to regulate the distribution of alcohol within their own borders, Congress did not need to expressly address the issue of the potential invalidation of a State liquor law by a federal statute directly related to the distribution of alcohol. Simply stated, Congress does not have the authority to enact a statute that *directly* regulates the distribution of alcohol within the State's borders. This position is further supported by the fact that Congress, through the Twenty-first Amendment

(1917), and has not been repealed.

Enforcement Act, created a federal cause of action based solely upon the violation of a State law.  In other words, Congress only has the authority to pass regulations which indirectly affect the distribution of alcohol – such as the FAA.  By the rationale of Stephens, a statute which only indirectly relates to the distribution of alcohol in New York State can not preempt the constitutional and congressional grant of the direct and exclusive right to regulate.

B.    SECTION 55-C IS SAVED BY THE TWENTY-FIRST
      AMENDMENT TO THE CONSTITUTION

      Even if the Court were to determine that Congress intended for the FAA to preempt State liquor law regulations, §55-c's ban on pre-dispute arbitration provisions is saved by the 21st Amendment.  New York's statute falls within the "core" of the 21st Amendment and New York's interests thus outweigh the federal interest behind the FAA.

            1.    The Twenty-First Amendment

      Enacted as part of the repeal of Prohibition, the 21st Amendment, by its very terms, gives the states control over the transportation or importation of liquor into their territories.  Nevertheless, despite the broad language of the Amendment, the Supreme Court has made it clear that the states' powers over liquor are not absolute.  For example, in *California Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc.,* 445 U.S. 97, (1980), the Court held that California's system for wine pricing violated the Sherman Act.  Likewise, in *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, (1984), the Court held that federal regulations relating to cable transmissions preempted Oklahoma's prohibitions against broadcasting of advertisements for alcoholic beverages.  Finally, a state's attempt to favor in-state industries by erecting discriminatory barriers to out-of-state entities violates the dormant Commerce Clause.  *See Granholm v. Heald*, 125 S. Ct.

1885, 161 L. Ed. 2d 796 (2005); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, (1984).  In each of those cases, the regulations were (i) either solely enacted to advantage local over out-of-state entities, or (ii) only indirectly involved the States' authority under the Twenty-First Amendment and ran afoul of important federal policy.

However, the present circumstance is distinguishable because (i) the State statute involved directly concerns the liquor distribution system (ii) the State is acting within what has been described as the "core" powers reserved to the States under the Twenty-first Amendment and (iii) the State Statute regarding arbitration does not discriminate against out-of-state parties and thus does not violate the Dormant Commerce Clause. When exercising such "core" power, the appropriate States have virtually unfettered discretion to enact legislation.  *See North Dakota v. United States*, 495 U.S. 423, (1990) ("the State has 'virtually complete control' over the importation and sale of liquor and the structure of the liquor distribution system"); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc*., 445 U.S. at 110 (1980) ("the Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system"); *Swedenburg v. Kelly*, 358 F.3d 223, 236 (2d Cir. 2004) ("in each case, the Court unequivocally reaffirmed the principle that insofar as section 2 [of the 21st Amendment] permits each state to regulate alcohol traffic within its borders it primarily created an exception to the normal operation of the

commerce clause"), *rev'd,* on other grounds 125 S. Ct. 1885, 161 L. Ed.2d 796 (2005)5;

*Bridenbaugh v. Freeman-Wilso*n, 227 F.3d 848, 851 (7th Cir. 2000) (noting that the

Supreme Court has recognized "core" concerns other than temperance), *cert. denied*, 532

U.S. 1002, 121 S. Ct. 1672 (2001); *Milton S. Kronheim & Co. v. District of Columbia*, 91

F.3d 193, 203 (D.C. Cir. 1996) ("Core enforcement purposes protected by section 2"

includes a state's "plenary power to regulate and control… the distribution, use, or

consumption of intoxicants within her territory after they have been imported.(citation

omitted)); *Kendall-Jackson Winery, Ltd. v. Branson*, 82 F.Supp.2d 844, 866 (N.D. Ill.

2000) ("The areas primarily reserved for state control by the Amendment are whether to

permit importation or sale of liquor and how to structure the liquor distribution system

within the state."(citation omitted)); *In re G. Heileman Brewing Co.*, 128 B.R. 876, 884

(S.D.N.Y. 1991) ("so long as the State law serves the State's interest in the

'transportation,' 'importation,' 'delivery,' or 'use' of liquor, it fulfills the express purpose

behind the Twenty-First Amendment").

     It is almost axiomatic to state that the 21st Amendment and the Commerce Clause

are two parts of the same Constitution, and both provisions "must be balanced in light of

---

[5] In *Swedenburg*, the Second Circuit upheld New York's ban on direct wine sales by out-of-state wineries, noting that the distribution of alcohol is a "unique area of commerce." 358 F.3d at 238. The Court of Appeals also re-affirmed the broad powers constitutionally granted to the States on "how to structure the liquor distribution system." *Id.* at 233. The Supreme Court reversed the Second Circuit, however, because it disagreed with the Court of Appeals' view that there was no indication "that the regulating scheme is intended to favor local interests over out-of-state interests." 358 F.3d at 237. To the contrary, the Supreme Court struck down the regulations because the High Court had no difficulty concluding that New York was in fact discriminating against out-of-state wineries in favor of in-state wineries. *Granholm v. Heald*, 125 S.Ct. at 1896-97 (2005). As noted below, §55-c differs from the regulations involved in *Granholm* and *Swedenburg*, because §55-c treats all entities equally and out-of-state brewers are regarded the same as in-state brewers.

each other in any concrete case." *Capital Cities*, 467 U.S. at 712; *Midcal*, 445 U.S. at 109-10; *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 332, 84 S. Ct. 1293, 12 L.Ed.2d 350 (1964). However, so long as the state regulation is (i) non-discriminatory, (ii) does not run afoul of a fundamental Constitutional prohibition such as the Equal Protection Clause or the First Amendment, and (iii) serves a direct or "core" interest under the Twenty-First Amendment, any conflict between the state statute and federal commerce law will be resolved in favor of the state statute. *See North Dakota v. United States*, 495 U.S. 423, 433 (1990) ("Given the special protection afforded to state liquor control policies by the Twenty-first Amendment, they are supported by a strong presumption of validity and should not be set aside lightly."); *Bainbridge v. Turner*, 311 F.3d 1104, 1112 (11th Cir. 2002) ("the Amendment removes the constitutional cloud from the challenged law so long as the state demonstrates that it genuinely needs the law to effectuate its proffered core concern"); *Milton S. Kronheim v. District of Columbia*, 91 F.3d 193, 203 (D.C. Cir. 1996); In *re G. Heileman Brewing Co. Inc.,* 128 B.R. 876, 882 (S.D.N.Y. 1991) ("Where, however, there is conflict between federal and State law and the State Law is within its 'jurisdiction' and serves a direct Twenty-First Amendment interest, the State law will prevail"). *324 Liquor Corp. v. Duffy*, 479 U.S. 335 (1984); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, (1984); *Capital Cities*, 467 U.S. at 714; *Dickerson v. Bailey*, 336 F.3d 388, 404-07 (5th Cir. 2003); *Beskind v. Easley*, 325 F.3d 506, 513(4th Cir. 2003), *Bainbridge v. Turner*, 311 F.3d 1104, 1112 (11th Cir. 2002).

  2. <u>New York's Interest Outweighs the Federal Interest</u>

  As noted above, New York has chosen to structure a three-tier distribution network for the sale of alcoholic beverages. The statutory scheme includes licensing and extensive reporting requirements. This extensive statutory framework falls under the

29

State's core power to regulate the distribution of alcoholic beverages.  *See North Dakota v. United States*, 495 U.S. at 439 (1990); *Swedenburg*, 358 F.3d at 233; *In re G. Heileman*, 128 B.R. at 884-85 (S.D.N.Y. 1991).

An integral part of the overall three-tier regulatory scheme, §55-c strengthens the rights of distributors relative to suppliers by, among other things, making it illegal for suppliers to terminate or modify distribution agreements without cause.  This ensures that the three-tier system is really a three-tier system, not a two-tier system with the middle tier (the wholesaler) acting as a mere agent or instrumentality of powerful suppliers.  The various protections afforded to wholesalers support the laudatory goal of creating stable, proficient, ethical and established distributors.  .

Although it did not involve the FAA, an extremely analogous and well-reasoned case decided by the federal Bankruptcy court in the Southern District of New York held that the United States Bankruptcy Code did not preempt Oregon's statutory protections relating to the relationship between beer wholesalers and brewers.  *In re G. Heileman Brewing Co.*, 128 B.R. 876 (S.D.N.Y. 1991).

In *Heileman*, the brewer had declared bankruptcy and sought to reject a pre-petition distribution agreement under 11 U.S.C. §365(a).  The distributor opposed arguing that the rejection failed to comply with the termination procedures set forth under Oregon's Franchise Protection Act for Trade Practices Relating to Malt Beverages (the "Oregon Act").  Similar to the protections under §55-c, under the Oregon Act distributors could only be terminated for cause and had to be provided written notice and an opportunity to cure.  *See* 128 B.R. at 881-82.  Accordingly, there was a direct conflict between the federal Bankruptcy Code's provision allowing an estate to reject executory

contracts, and the Oregon Act's prohibition against terminating distribution agreements without cause.

After reviewing Supreme Court precedent, the court in *Heileman* concluded that the Oregon Act fulfills the express purpose behind the Twenty-first Amendment, and noted that the States have "virtually complete control" over the structure of the liquor distribution system. 128 B.R. at 882-883. In holding that the Bankruptcy Code must yield to the Twenty-First Amendment, the court stated:

> [The Oregon Act] and its related statutes were enacted in the public interest under the Twenty-First Amendment. Together, all the laws benefit Oregon's public and are a direct exercise of Oregon's "core" power to regulate Alcohol. [The Act] is unquestionably a necessary component to Oregon's valid State interest in assuring stable, long-term distribution agreements.

128 B.R. at 885.

Likewise, §55-c as a whole (and specifically the forum and choice of law provisions thereof) is unquestionably a necessary component of New York's statutory scheme governing the distribution of alcoholic beverages. As such, §55-c is a direct exercise of New York's core power to regulate the importation and sale of alcohol.

### POINT VI

### THE CONSTITUTIONAL ISSUES SHOULD BE DECIDED BY A COURT OF LAW

In these Arbitrations, Coors is seeking to litigate the constitutionality of §55-c. Specifically, Coors states that the provisions of Section 55-c relating to a brewer's ability to terminate a distribution agreement pursuant to a national policy of consolidation violates the Dormant Commerce Clause of the United States Constitution in that it impermissibly regulates the conduct of Molson and Coors beyond the boundaries of the

31

state of New York.   Simply put, arbitrators do not have the authority to decide this

constitutional issue.  As such, the Arbitrations should be permanently stayed.

Constitutional issues properly lie with the expertise of the courts, rather than with

an arbitrator.  *See Coppinger v. Metro-North Commuter R.R.,* 861 F.2d 33 (2d Cir. 1988)

(finding that arbitrators are not vested with the broad power to apply and interpret the

United States Constitution); *Gonzalez v. Shanker,* 399 F. Supp.858 (S.D.N.Y. 1975).  It is

for this reason the courts do not grant preclusive effect to an arbitration decision that

interprets constitutional issues.  *See Benjamin v. Traffic Executive Ass'n Eastern*

*Railroad,* 869 F.2d 107 (2d Cir. 1989).

Indeed, the Supreme Court has acknowledged in *Alexander v. Gardner-Denver*

*Co.,* 415 U.S. 36, 57 (1974) when discussing the issue of Title VII rights, that "[a]rbitral

procedures, while well suited to the resolution of contractual disputes, makes arbitration a

comparatively inappropriate forum for the final resolution of rights created by Title VII."

"[T]he specialized competence of arbitrators pertains primarily to the law of the shops,

not the law of the land. . . . Parties usually choose an arbitrator because they trust his

knowledge and judgment concerning the demands and norms of industrial relations.  On

the other hand, the resolution of statutory or constitutional issues is a primary

responsibility of courts."

Rule 5.1 of the Federal Rules of Civil Procedure ("FRCP") lends further support

to the finding that constitutional issues should be determined in court, rather than in

arbitration.  Specifically, FRCP Rule 5.1 entitled <u>Constitutional Challenge to a Statute</u>,

provides that a party challenging the constitutionality of any federal or state statute must

file a notice of the challenge and serve the notice on the United States Attorney General

or the attorney general of the appropriate state.   This rule further provides that the district

court must certify the challenge to ensure that the affected federal or state officer has the opportunity to exercise its statutory right to intervene. Contrary to federal court, in situations like the instant one, the parties to arbitration do not notify the attorney general of the state when they are challenging the constitutionality of a state statute. Thus, the arbitrator will not have the benefit of all of the relevant facts when determining the issue.

In this case, issuing a stay of the Arbitrations is also warranted by virtue of the fact that Coors has asserted the identical claims, including the identical constitutional challenge to §55-c in the United States District Court for the Eastern District of Virginia against Oak and Boening. A judicial finding that §55-c is unconstitutional will have a dramatic effect on the beer industry in not only the state of New York but those other states that have enacted similar legislation. Thus, it would seem necessary and appropriate for this Court to stay the Arbitrations as a result of the Federal Action to avoid the prejudicial effect of inconsistent rulings with regard to the constitutionality of §55-c.

<u>**CONCLUSION**</u>

For all of the reasons set forth herein, it is respectfully submitted that this Court grant Plaintiff a Preliminary Injunction enjoining the Arbitrations as set forth in the Order to Show Cause submitted herewith, pending the outcome of this action.

Dated: Garden City, New York
        January 16, 2008                    ETTELMAN & HOCHHEISER, P.C.


                                           By: /s/ Gary Ettelman
                                               Gary Ettelman (GE 9315)
                                           Attorneys for Plaintiffs
                                           100 Quentin Roosevelt Blvd., Suite 401
                                           Garden City, New York 11530
                                           (516) 227-6300